LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
Shanshan Zheng (SZ 3301)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

KAI PENG, SAIZHANG GUAN and LONGBIN LI,
*on behalf of themselves and the Class,*

                        Plaintiffs,

          v.

UBER TECHNOLOGIES, INC.

                        Defendant.

---

Case No.:

**CLASS ACTION COMPLLAINT**

Jury Trial Demanded

---

       Plaintiffs KAI PENG, SAIZHANG GUAN, and LONGBIN LI (collectively, "Plaintiffs") bring this action individually and on behalf of all other persons similarly situated, by and through their attorneys, against Defendant, UBER TECHNOLOGIES, INC. ("Uber" or "Defendant"), and allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of counsel and public statements issued by Uber.

**<u>INTRODUCTION</u>**

       1.      Uber provides car services through a smartphone application, which enables users to arrange and schedule transportation and/or logistics services with drivers (the "Uber drivers"). Founded in San Francisco in 2009 by Garrett Camp and Travis Kalanick, Uber has since undergone

tremendous expansion. The silicon valley company, now valued at $62.5 billion, provides car services in almost every major cities in the United States and 67 countries worldwide with over 1 billion in ridership.

2.      Though currently the top car service smartphone app in the United States, Uber is facing fierce competition from similar smartphone apps such as Lyft. The success of Uber's business model depends on creating a large network of drivers so that customer wait time is minimized. In order to ensure a steady supply of drivers, Uber launched its "New York City 2015 Guarantee Program" (the "Program") in mid-2015 to attract more drivers and increase its market presence.

3.      Under the Program, Uber guaranteed new Uber drivers a minimum compensation of between $5,000 and $7,000 each month between July and December 2015. Uber promised that if an Uber driver made less money in a given month than the guaranteed earnings, Uber would pay the *difference* between the guaranteed earnings and the driver's actual earnings (the "Guarantee Payout"), provided that the Uber driver met certain criteria. The guaranteed earning amount therefore set a floor, but not a ceiling, to what an Uber driver would earn in a month.

4.      This class action seeks redress for Defendant's failure to fulfill its contractual obligations under the Program by wrongfully denying Uber drivers the Guarantee Payout, which constitutes a material breach of contract, fraud and negligent misrepresentations in their dealings with Plaintiffs and tens of thousands of other Uber drivers in New York City.

5.      Plaintiffs bring this class action lawsuit on behalf of themselves and a class of persons who worked as Uber drivers and participated in Uber's "New York City 2015 Guarantee" program and but were denied guaranteed earnings (the "Class").

6.      Specifically, under the original terms of the Program implemented in or about June

2

2015, Uber initially set forth three (3) requirements for an Uber driver to receive a certain month's Guarantee Payout, which includes:

> (1) accepting 90% of trips in that month;
>
> (2) being online for at least 200 hours in that month; and
>
> (3) completing at least 200 trips in that month of NYC trips.

In or about October 2015, however, Uber unilaterally and retroactively added a fourth requirement, requiring an Uber driver to complete at least one trip per hour (the "Per-Hour Requirement") in order to qualify for October's Guarantee Payout. In or about November 2015, Uber added a fifth requirement, requiring Uber drivers to "opt-in" to a specific month's Guarantee Payout through a link provided in the email to Uber drivers (the "Opt-in Requirement," together with the Per-Hour Requirement, the "Additional Requirements").

7.  Defendant's retroactive and unilateral addition of the Additional Requirements excluded Plaintiff KAI PENG and thousands of other Uber drivers from being qualified for the Guarantee Payout. Plaintiff KAI PENG and other Uber drivers suffered damages from Defendant's unilateral and retroactive actions.

8.  Moreover, Uber also denied Plaintiffs KAI PENG, SAIZHANG GUAN and LONGBIN LI and thousands of other Uber drivers the Guarantee Payout even though they had fulfilled all the requirements for a specific month, including the Additional Requirements. Uber provided no clear explanations as to why they were denied their Guarantee Payout because Uber knew its denial of Class members their Guarantee Payout was wrongful.

9.  As a result of Defendant's unfair, deceptive, fraudulent and unconscionable business practices, Plaintiffs and the Class have suffered injury in fact and damages.

10.  Accordingly, Plaintiffs bring this action to redress damages to them and the Class

due to Defendant's breach of contract, common law fraud, negligent misrepresentation, breach of the duty of good faith and fair dealing, unjust enrichment, and violations of statutes prohibiting unfair trade practices, including the New York Deceptive Acts and Practices Act.

**PARTIES**

**Plaintiff Kai Peng**

11.     Plaintiff KAI PENG is a resident of, and domiciled in, Queens County in the State of New York.

12.     Plaintiff KAI PENG started working as an Uber driver from June 2015 after seeing Uber's advertisement for the Program on MTA buses. Relying on Defendant's advertisement representations, Plaintiff KAI PENG signed up as an Uber driver and purchased a new 2015 Toyota RAV4 to use as his working vehicle.

13.     Plaintiff KAI PENG is still currently working as an Uber driver.

14.     At all relevant times, Plaintiff KAI PENG worked as an Uber driver and provided car service in the New York City metro area on a daily basis.

15.     After signing up for the Program, Plaintiff KAI PENG started to receive the Guarantee Payout from July to September 2015.

16.     In October 2015, Plaintiff KAI PENG met all three original requirements under the Program to receive the Guarantee Payout. However, Plaintiff KAI PENG did not receive the Guarantee Payout for October 2015 and was informed by Uber that he did not qualify for the Guarantee Payout because he did not satisfy the Per-Hour Requirement, which Uber added unilaterally and retroactively.

17.     In November 2015, Plaintiff KAI PENG satisfied all of the requirements under the Program, including the Additional Requirements, to receive the Guarantee Payout. Plaintiff KAI

4

PENG, however, was again denied the Guarantee Payout for November 2015.

18.    As a result of Defendant's failure to fulfill its contractual obligations, Plaintiff KAI PENG was injured.

**Plaintiff Saizhang Guan**

19.    Plaintiff SAIZHANG GUAN ("Plaintiff GUAN") is a resident of, and domiciled in, Queens County in the State of New York.

20.    Plaintiff GUAN started working as an Uber driver from August 2015. Relying on Defendant's advertisement representations in August 2015, Plaintiff GUAN started to work toward satisfying the requirements for the Guarantee Payout.

21.    Plaintiff GUAN is still currently working as an Uber driver.

22.    As an Uber driver, Plaintiff GUAN provided car service in the New York City metro area on a daily basis.

23.    In each of November and December 2015, Plaintiff GUAN satisfied all the requirements under the Program to receive the Guarantee Payout, including the Additional Requirements. Plaintiff GUAN, however, was denied the Guarantee Payout for each of November and December 2015.

24.    In late January 2015, Plaintiff GUAN received a direct deposit into his Uber account which represented his Guarantee Payout for December 2015. However, Plaintiff GUAN still did not receive his November Guarantee Payout.

25.    Defendant failed to fulfill its contractual obligations and Plaintiff GUAN was injured as a result.

**Plaintiff Longbin Li**

26.    Plaintiff LONGBIN LI ("Plaintiff LI") is a resident of, and domiciled in, Queens

County in the State of New York.

27.     Plaintiff LI started working as an Uber driver from October 2015 after seeing Uber's advertisement for the Program. Relying on Defendant's advertisement representations, Plaintiff LI signed up as an Uber driver.

28.     Plaintiff LI is still currently working as an Uber driver.

29.     As an Uber driver, Plaintiff LI provided car service in the New York City metro area on a daily basis.

30.     In each of November and December 2015, Plaintiff LI satisfied all of the requirements under the Program to receive the Guarantee Payout, including the Additional Requirements. Plaintiff LI, however, was denied the Guarantee Payout for each of November and December 2015.

31.     Defendant failed to fulfill its contractual obligations and Plaintiff LI was injured as a result.

**Defendant**

32.     Defendant UBER TECHNOLOGIES, INC. is a business corporation organized under the laws of the state of Delaware, with its principal place of business at 1455 Market Street, San Francisco, CA 94103 and an address for the service of process at C/O National Registered Agents, Inc., 111 Eighth Avenue, New York, NY 10011.

**JURISDICTION AND VENUE**

33.     This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). This is a putative class action whereby: (i) the proposed class consists of over 100 class members; (ii) at least some of the proposed class members have a different citizenship from Defendant; and (iii) the amount in controversy exceeds the sum of value of $5,000,000.00,

excluding interest and costs.

34.     The Court has jurisdiction over the state law claims because they form part of the same case or controversy under Article III of the Unites States Constitution.

35.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

36.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendant, pursuant to New York Statute, N.Y. CVP. Law § 302, because they conduct substantial business in this District, some of the actions giving rise to the Complaint took place in this District, and some of Plaintiffs' claims arise out of Defendant operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendant's acts and omissions outside this state.

37.     Defendant is subject to personal jurisdiction in this Court because it has engaged in systematic and continuous contacts with this district by virtue of their business activities.

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendant has caused harm to class members residing in this District, and the Defendant is residents of this District under 28 U.S.C. 1391(c)(2) because they are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### The Uber Smartphone App

39.     Uber provides for-hire vehicles ("Uber cars") which can be hailed and dispatched

7

through its smartphone app. On the user end, the Uber smartphone app ("Uber user app") allows the user to hail nearby Uber cars, the location of which can be seen on the user's smartphone.

40.    An Uber driver uses the driver end of the Uber smartphone app (the "Uber driver app") to receive dispatches and provide car services to Uber's users.

41.    Uber's users typically pay their travel fare with a credit card linked to their Uber user account, which is registered on the Uber user app. Uber then collects the travel fare from the user/customer on behalf of the Uber driver.

42.    Uber drivers receive their earnings from Uber on a weekly basis, which is typically accompanied by an earnings statement sent to their email address:

| Day | Trips | Fares[1] | ⑧ Surge | Uber Fees | Earnings |
|---|---|---|---|---|---|
| Dec 21 | 4 | $178.63 | $0.00 | ($44.67) | $133.96 |
| Dec 22 | 3 | $65.93 | $0.00 | ($16.48) | $49.45 |
| Dec 23 | 4 | $79.38 | $0.00 | ($19.85) | $59.53 |
| Dec 24 | 3 | $32.61 | $0.00 | ($8.15) | $24.46 |
| Dec 25 | 6 | $136.18 | $0.00 | ($34.05) | $102.13 |
| Dec 26 | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| Dec 27 | 1 | $8.00 | $0.00 | ($2.00) | $6.00 |
| | | | | Toll | $11.08 |
| | | | | Sales Tax | ($9.80) |
| | | | | Black Car Fund | ($10.02) |
| Total Payout | | | | | $334.79 |

43.    In addition to the earnings statement, every week Uber also generates a weekly review for each Uber driver, informing them of their performance in a given week in terms of indexes such as number of trips accomplished, "hours online," "fare/hour," acceptance rate and driver rating:

8



**The New York City 2015 Guarantee Program**

44.     Uber launched the New York City 2015 Guarantee Program (the "Program") in mid-2015. Uber guaranteed new Uber drivers a minimum compensation of between $5,000 and $7,000 each month between July and December 2015:

THE GUARANTEE DECREASES EACH MONTH BASED ON YOUR ACTIVATION DATE -- THE SOONER YOU START, THE GREATER THE EARNINGS!

| START DATE IS BEFORE | GUARANTEE |
|---|---|
| JULY 10 | $35,000 |
| AUGUST 10 | $30,000 |
| SEPTEMBER 10 | $25,000 |
| OCTOBER 10 | $20,000 |
| NOVEMBER 10 | $14,000 |
| DECEMBER 10 | $7,000 |

See http://www.driveubernyc.com/2015h2guar/.

45.     In the above table, Uber used the cumulative guaranteed earning figures in order to attract more drivers. However, whether an Uber driver qualified for the Guarantee Payout was determined on a month-to-month basis.  As Uber explained in the "Frequently Asked Questions" section,

- **If I don't meet the qualifications one month and therefore don't get the guarantee, can I still get it for other months?**

  **Yes! We'll look at each month individually. If you didn't get July, you can still get August - December!**

See http://driveubernyc.com/2015h2guar/.

46.     Therefore, the actual guaranteed earnings under the Program are:

- $5,000 for July 2015;

- $5,000 for August 2015;

- $5,000 for September 2015;

- $6,000 for October 2015;

- $7,000 for November 2015; and

- $7,000 for December 2015.

47.     Uber promised that if an Uber driver made less money in a given month than the guaranteed earnings, Uber will pay them an additional amount to bring up the Uber driver's earning to the guaranteed earning amount (the "Guarantee Payout"):

# 2015 GUARANTEE



Make $7,000 in net fares by the end of the year, guaranteed.

If you make less but meet the criteria, we will pay you the difference.

See Uber's advertising campaign webpage created for the Program at http://www.driveubernyc.com/2015h2guar/ (the "Webpage." A complete printout of the Webpage is attached herein as **EXHIBIT A**).

48.   Uber listed the following examples on the Webpage:

**FREQUENTLY ASKED QUESTIONS AND EXAMPLE CALCULATIONS**

| TYPE | DEFINITION | EXAMPLE 1 | EXAMPLE 2 |
|---|---|---|---|
| FARES | Base Fare, Time and Distance | $3,500 | $4,800 |
| SURGE | | $300 | $200 |
| CANCELATIONS | | $200 | $400 |
| TOLLS & SURCHARGES | | $0 | $100 |
| **GROSS FARES** | **Fares + Cancelations + Surge + Tolls** | $4,000 | $5,500 |
| UBER'S SERVICE FEE | 25% of Fares + Surge + Cancelations | $1,000 | $1,350 |
| SALES TAX | 8.15% of Gross Fares | $326 | $440 |
| BLACK CAR FUND FEE | 2.25% of Gross Fares | $90 | $121.50 |
| NET FARES | **Gross Fares - Uber's Service Fee - Sales Tax - Black Car Fund** | $2,584 | $3,588.40 |
| GUARANTEE PAYOUT IN MONTH WITH $5,000 GUARANTEE | | $2,416 | $1,411.60 |

49.   Uber's monthly Guarantee Payout is, not surprisingly, contingent upon a series of fine print requirements. In the "*Terms and Conditions" section on the Webpage, it *currently* represents:

*TERMS AND CONDITIONS:

Only new (never completed a trip prior to 5/18/15) partners in New York City are eligible for the guarantees.

New partners will be eligible for each month of the guarantee. If you do not hit the requirements for a given month, you will not earn that month's guarantee, but you will still be eligible for the next months' guarantees. To qualify for the guarantee in you must opt-in through the unique link provided in specific company communications. Monthly guarantee payments are subject to being withheld as deemed appropriate.

Only NYC partners driving uberX, uberXL, UberBLACK or UberSUV are eligible. This offer does not extend to New Jersey, Long Island, Westchester, Connecticut, or uberT partners.

This guarantee is for net fares. Net fares is defined as all money received in trips (including cancelation fees) minus Uber's Service Fee, Sales Tax and Black Car Fund fees. Miscellaneous deductions such as vehicle payments, phone data fees and device deposits are not included in this net ; this guarantee is before those deductions. Net fares are just like "Driver Earnings" on your payment statement, except that for this guarantee it's based on a month instead of by week:

**Your Name : Payment Statement**



Payouts will be made the first week of each month. Partners' accounts must still be active on that date to be eligible.

In order to qualify for a given month's guarantee, you must:

1. Accept 90% of trips in that month
2. Be online for at least 200 hours in that month
3. Complete at least 200 trips in that month (only NYC trips count towards this total)
4. Complete at least 1 trip per hour

50.   The Webpage was maintained and updated by Uber throughout the term of the Program. When Uber updated the content of the "Terms and Conditions" section on the Webpage, however, it never provided Uber drivers any notice of such updates.

51.   For example, when the Program was launched, Uber only listed the first three (3) requirements on the Webpage, upon which Uber drivers, many of whom attracted by Uber's advertising campaign for the Program, relied. Uber later unilaterally added the Additional Requirements, i.e., the Per-Hour Requirement and the Opt-in Requirement, to the Terms and Conditions published on the Webpage. Uber did not provide Uber drivers with any notice when they updated the Webpage.

**Uber Breached the October 2015 Contract by Adding the Per-Hour Requirement Unilaterally and Retroactively**

52.     Uber typically sent out an email to each Uber driver in the first week of a month with a statement of **the driver's past month's hours online, trips** completed, acceptance rate, etc., and informing him or her whether he or she has qualified for the past **month's** Guarantee Payout. In the same email Uber would also **list the Program's requirements.**

53.     For example, on August 3, 2015, Uber sent to Uber drivers the following email:



## Congratulations, you're eligible for the $30,000 Guarantee**
--
## For August alone, the guarantee is $5,000!

| MONTH | GUARANTEE |
|---|---|
| AUGUST | $5,000 |
| SEPTEMBER | $5,000 |
| OCTOBER | $6,000 |
| NOVEMBER | $7,000 |
| DECEMBER | $7,000 |
| TOTAL | $30,000 |

## TO QUALIFY FOR THE GUARANTEE:

1. Log in to the Uber Partner app for at least 200 hours in the month
2. Complete at least 200 trips in the month
3. Accept 90% of dispatches

Have a great month!
-Uber NYC

**To qualify for the $30K guarantee you must complete your first trip before August 10.
Net Fares is defined as total fares less Uber Fee, Sales Tax and Black Car Fund.
Visit 1.uber.com/h2-35k for details and requirements.

54.     As demonstrated above, Uber only listed three (3) requirements for an Uber driver

to receive the Guarantee Payout for August 2015:

> (i)     Log in to the Uber driver app for at least 200 hours in that month;
>
> (ii)    Complete at least 200 NYC trips in that month; and
>
> (iii)   Accept at least 90% of all dispatches.

55.    Uber listed the same three (3) requirements in its email to Uber drivers in the first week of each of July, August, September and October.

56.    On October 5, 2015, Uber sent an email (the "October 5 email") to Uber drivers participating in the Program, including Plaintiff KAI PENG. Consistent with prior months, October 5 email contained the same three (3) requirements for October's Guarantee Payout.



Welcome to Month 4
of the $35,000 Guarantee**
--
For October alone, the guarantee is $6,000!

| REMAINING MONTHS | GUARANTEE |
|---|---|
| OCTOBER | $6,000 |
| NOVEMBER | $7,000 |
| DECEMBER | $7,000 |
| TOTAL REMAINING VALUE | $20,000 |

### TO QUALIFY FOR THE GUARANTEE THIS MONTH:

1. Log in to the Uber Partner app for at least 200 hours in the month
2. Complete at least 200 NYC trips in the month
3. Accept 90% of dispatches

### Last month, you:

1. Logged into the Uber Partner app for 207 hours.
2. Completed 200 trips.
3. Accepted 95.91% of dispatches.
4. Earned $3074.42 in net fares.

### As a result: you qualified for the guarantee and we have added $1925.58 to your account.

Have a great month!
-Uber NYC

**To qualify for this month's portion of the guarantee you must complete your first trip
before October 10.
Net Fares is defined as total fares less Uber Fee, Sales Tax and Black Car Fund.
Visit t.uber.com/n2-35k for details and requirements.

**Uber's October 5 Email to Plaintiff PENG**

57.      As shown in the above email, based on the criteria specified in the October 5 email, which remained consistent with July, August and September, Plaintiff PENG received the Guarantee Payout for September 2015. However, although Plaintiff PENG also satisfied all of the

15

three (3) requirements for October, to his surprise, Plaintiff PENG was denied the Guarantee Payout in November for the October 2015 Program period. In the email from Uber on November 7, 2015 (the "November 7 email"), Plaintiff PENG was informed that he was disqualified for the Guarantee Payout for October because he did not fulfill a fourth requirement, i.e., the Per-Hour Requirement.



Welcome to Month 5
of the $35,000 Guarantee**
--
For November alone, the guarantee is $7,000!

| REMAINING MONTHS | GUARANTEE |
|---|---|
| NOVEMBER | $7,000 |
| DECEMBER | $7,000 |
| TOTAL REMAINING VALUE | $14,000 |

## TO QUALIFY FOR THE GUARANTEE THIS MONTH:

1. Log in to the Uber Partner app for at least 200 hours in the month
2. Complete at least 200 NYC trips in the month
3. Accept 90% of dispatches
4. Complete at least 1 trip per hour
5. Opt-in to the November guarantee by confirming your participation through this link: November Guarantee Opt-In

## Last month, you:

1. Logged into the Uber Partner app for 224.8 hours.
2. Completed 205 trips.
3. Accepted 95.10% of dispatches.
4. Earned $2956.8 in net fares.
5. Completed 0.9 trips per hour.

As a result: you did not qualify for the guarantee because you reached only 3 of 4 requirements.

Have a great month!
-Uber NYC

**Uber's November 7 Email to Plaintiff PENG**

58.     As shown in the above November 7 email, Uber added the Additional Requirements (the requirement that Uber drivers must complete at least one trip per hour and that Uber drivers must "opt-in" through a hyperlink), as prerequisites to receiving the Guarantee

17

Payout and retroactively applied those Additional Requirements to the October Guarantee Payout. These requirements were not in the October 5 email.

59.    Plaintiff PENG and other Uber drivers did not receive any other notice that the Additional Requirements were added to the Program as prerequisites to the October Guarantee Payout.

60.    Moreover, Defendant's unilateral addition of the Per-Hour Requirement is confusing. Defendant never explained nor defined "per hour." An "hour" could mean every hour during the month, which would require that all drivers never sleep. Alternatively, if an hour meant each hour that a driver is logged into the Uber driver app to be able to accept customers, then it directly conflicts with the Program requirement number 1, which requires all drivers to be logged in for at least 200 hours per month. In order to satisfy the Per-Hour Requirement, a driver could be available but not getting any customers through no fault of his own.

61.    Uber's conduct was unilateral and retroactive.

62.    Uber's unilaterally and retroactively conduct of adding the Per-Hour Requirement and denying Plaintiff PENG and other Uber drivers the Guarantee Payout for October 2015 was unfair, oppressive and unconscionable and severely infringed upon Plaintiffs and other Uber drivers' rights provided by contract and by law.

63.    Uber's unilaterally and retroactively conduct of adding the Per-Hour Requirement and denying Plaintiff PENG and other Uber drivers the Guarantee Payout for October 2015 constitutes material breach of contract.

**Uber Breached the November and December 2015 Contract by Failing to Pay the Guarantee Payout**

64.    Uber continued to impose the same five (5) requirements it had retroactively imposed for October 2015 for each of November and December 2015.

65.    Each of Plaintiffs, KAI PENG, SAIZHANG GUAN and LONGBIN LI, had fulfilled each of the five (5) requirements.

66.    None of the Plaintiffs, however, received their Guarantee Payout for November 2015. Plaintiffs initially also did not receive their Guarantee Payout for December 2015 until in late January, 2016, when Plaintiffs PENG and GUAN were informed that Uber has added to their accounts their Guarantee Payout for December 2015. Plaintiff LI never received his December 2015 Guarantee Payout.

67.    Uber initially provided no written explanation as to why Plaintiffs did not receive their Guarantee Payout for November or December, nor did Plaintiffs receive the monthly email they would normally receive in the first week of the following month stating their hours online, trips accomplished, acceptance rate and whether they qualified for the Guarantee Payout – which Plaintiffs had been receiving for prior months – for each of November and December 2015.

68.    Plaintiffs inquired about the missing Guarantee Payout through Uber's online system but received no meaningful explanation.

69.    When Plaintiffs inquired in person at Uber's offices located at 27-55 Jackson Avenue, Long Island City, NY 11101 and 633 W 27th St., New York, NY 10001, in December 2015, they were told that they were denied the Guarantee Payout because they had picked up repeat customers, which, as Uber asserted, was prohibited.

70.    However, nowhere in the Program's terms and conditions, email correspondence, nor anywhere in the world had Uber stated that picking up repeat customers would disqualify an Uber driver from receiving the Guarantee Payout.

71.    In or about late January, 2016, however, Plaintiff PENG found out that Uber deposited December Guarantee Payout in his account.

72.    A few days later, Plaintiff GUAN also received an email from Uber informing him that he received the December Guarantee Payout.   In such email, Defendant made the vague allegation of "improper use of the Uber platform, which is contrary to our terms" but did not specify the "terms" which Plaintiff GUAN allegedly violated. In fact, such terms did not exist.



73.    Plaintiff LI never received his December Guarantee Payout.

74.    Plaintiff PENG, despite having satisfied all three original requirements, never received his October Guarantee Payout.

75.    None of Plaintiffs PENG, GUAN and LI received their November Guarantee Payout.

76.    Because Plaintiffs and other Uber drivers fulfilled their contractual obligations under the Program, Defendant's nonperformance constituted material breach.

77.    Plaintiffs and the Class accepted Defendant's offer by their performance, thereby entering into a contractual relationship with Defendant.

78.    As a result of Defendant's unfair, deceptive and unconscionable acts or practices as described herein, Defendant breached the contract and Plaintiffs and the Class suffered damages.

**Plaintiffs and the Class Did Not Assent to Uber's Arbitration Clause**

79.    Plaintiffs did not receive notice of Uber's arbitration clause. The arbitration clause was never included in Uber's advertising campaign material for the Program. It was also not included on the Webpage which was created exclusively for the promotion of the Program. There was no mention of the arbitration clause in the "*Terms and Conditions" section, which is prominently displayed on the top part of the Webpage (*see* ¶ 48; *see also* **EXHIBIT A**). A viewer could reasonably believe that the "*Terms and Conditions" section therein contained all the terms and conditions of the offer tendered by Uber under the Program.

80.    The arbitration clause was also never mentioned in any of Uber's email correspondence related to the Program.

81.    The only reference to Defendant's arbitration clause is not on the face of the Webpage, but can only be accessed by clicking on a minute "Terms and Conditions" link in 6-

point font located on the very bottom of the Webpage (*see* below; *see also* **EXHIBIT A**), an extremely inconspicuous area on the Webpage which cannot be seen unless scrolled all the way to the bottom of the Webpage and could therefore easily escape a viewer's notice. Moreover, even if a viewer had seen the "Terms and Condition" link on the bottom of the Webpage, he or she could reasonably believe that it was redundant because he or she had read the "*Terms and Conditions" on the face of the Webpage, and would therefore not click on the link.

Privacy Policy and Terms and Conditions

Location & Contact

82.     Even assuming that a viewer had clicked on the "Terms and Conditions" link, he or she might still not be put on notice of the arbitration clause. The link is hyperlinked to the "Legal" section on Uber's official website ([www.uber.com/legal/usa/terms](www.uber.com/legal/usa/terms)), which contains an article about the "Terms and Conditions" of using Uber's services (herein attached as **EXHIBIT B**). The arbitration clause (the "Arbitration Clause") is located, yet again, on the bottom of such article and also cannot be seen unless scrolled all the way to the bottom of the page.

83.     Because the "*Terms and Conditions" section on the face of the Webpage (*see* ¶ 48 and **EXHIBIT A**) is located dramatically more conspicuously for the viewer, a viewer can reasonably believe that the "*Terms and Conditions" section contained all the terms and conditions of the offer tendered under the Program and could also reasonably believe that the hyperlinked "Terms and Conditions" section is either redundant or irrelevant.

84.     Before Plaintiffs and the Class assented to Uber's offer under the Program by performance, they were never required to view, assent to, nor in any way confirm that they assent to, the Arbitration Clause.

85.     Plaintiffs and the Class in fact did not view and did not assent to the Arbitration

Clause before they performed.

86.     The Arbitration Clause was not part of Uber's offer under the Program which Plaintiffs and the Class accepted by performance and was therefore not part of the contract into which the parties entered.

**Uber's Arbitration Clause and any other Arbitration Provision in Its Licensing Agreement Is Unconscionable and Unenforceable**

87.     Any arbitration provision Uber has made part of its licensing agreement with Plaintiffs and the Class is both procedurally and substantively unconscionable and is therefore unenforceable. *See, e.g.,* Mohamed v. Uber Techs., Inc., 109 F. Supp. 3d 1185 (N.D. Cal. 2015); *O'Connor v. Uber Techs., Inc.*, No. 13-cv-03826-EMC, 2015 U.S. Dist. LEXIS 165182, at *21 (N.D. Cal. Dec. 9, 2015).

88.     The Arbitration Clause and any arbitration provision Uber has made part of its licensing agreement with Uber drivers is procedurally unconscionable because, *inter alia*, (i) Uber's licensing agreement with Uber drivers is an adhesion contract imposed and drafted by the party of superior bargaining strength and relegates the subscribing party only the opportunity to adhere to the contract or reject it, (ii) the opt-out right afforded under Uber's licensing agreement is illusory, (iii) the delegation clause within such licensing agreement is essentially hidden in the prolix printed form drafted by Uber, (iv) did not adequately disclose the disadvantages of arbitration, and (v) the Private Attorney General Act ("PAGA") waiver contained in such licensing agreement rendered the entire arbitration clause unenforceable.

89.     The Arbitration Clause and any arbitration provision Uber has made part of its licensing agreement with Uber drivers is substantively unconscionable because, *inter alia*, (i) Uber unfairly required part of the arbitration costs be borne by Plaintiffs and the Class, and (ii) the non-severable PAGA waivers contained in such licensing agreement rendered the entire arbitration

23

clause unenforceable.

90.     Notwithstanding the unenforceability of Uber's Arbitration Clause and any arbitration provision in any of its licensing agreements, Plaintiffs have opted-out of Uber's arbitration provision contained in the April 2015 Licensing Agreement, the December 2015 Licensing Agreement as well as the Arbitration Clause in the "Legal" section on Uber's official website (herein attached as **EXHIBIT B**). On February 1, 2016, Plaintiffs PENG, GUAN and LI emailed Uber at optout@uber.com and sent a letter via certified mail to Uber indicating that they elect to opt-out of Uber's arbitration provisions. *See* **EXHIBIT C, Plaintiffs'** opt-out notice letter to Uber dated February 1, 2016. On February 2, 2016, Plaintiffs also emailed Uber at optout@uber.com and sent a letter via certified mail indicating that any correspondence regarding the claims of the lawsuit to be directed to counsel and that no amounts may be paid by direct deposit representing any portion of the Guarantee Payout to the Plaintiffs directly and any such payment, if any, be directed to Plaintiffs' counsel. *See* **EXHIBIT D**, Plaintiffs' letter to Uber dated February 2, 2016.

## CLASS ALLEGATIONS

91.     Plaintiffs PENG, GUAN and LI bring this action on behalf of themselves, and on behalf of the following Class (the "Class") pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3):

> All persons who worked as an Uber driver, participated in the Program, and satisfied (i) all three (3) requirements as described herein for July through December 2015 which constituted Uber's offer for such periods under the Program, and/or (ii) all five (5) requirements as described herein for October through December 2015, but did not receive the Guarantee Payout from Uber for the corresponding period.

92.     Numerosity: While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and

obtainable by Plaintiffs only through the discovery process, Plaintiffs believe and on that basis allege that there are tens of thousands of members of the Class who worked as Uber drivers and were underpaid due to Defendant's deceptive acts or practices as described herein above.

93.     Ascertainiblity.  Class members can be easily identified from Defendant's database of Uber drivers' accounts and earning records.

94.     Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

     i. whether Plaintiffs and the Class assented to Defendant's offer under the Program;

     ii. whether Defendant failed to pay Plaintiffs and the Class their Guarantee Payout;

     iii. whether Defendant's failure to pay Plaintiffs and the Class their Guarantee Payout is a breach of contract;

     iv. whether Defendant's conduct constitutes deceptive business acts and practices;

     v. whether, as a result of Defendant's material breach, Plaintiffs and members of the Class have suffered an ascertainable loss of monies and/or value;

     vi. whether Plaintiffs and the Class relied on Defendant's promises to their own detriment;

     vii. whether Defendant was unjustly enriched;

     viii. whether Plaintiffs and Class members are entitled to monetary damages.

95.     Typicality:  All of Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of each member of the Class worked as an Uber driver, satisfied all requirements set forth by Uber but were still denied their Guarantee Payout.  Moreover, drivers who satisfied

even the Additional Requirements were not paid the Guarantee Payout. Furthermore, Plaintiffs and the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's failure to pay the Guarantee Payout despite Plaintiffs and the Class' satisfactory performance under the contract and wrongful conduct alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

96. <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained competent counsel who is highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

97. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of the Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and

notified based on, *inter alia*, Defendant's database of Uber drivers' accounts and earning records.

98.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**CAUSES OF ACTIONS**

**COUNT I**

**BREACH OF CONTRACT**

99.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

100.    Plaintiffs bring this cause of action on behalf of himself and on behalf of the members of the Class against Defendant.

101.    A unilateral contract existed between Plaintiffs and the Class, and Defendant.

102.    Plaintiffs and the Class accepted Defendant's offer by performing their contractual obligations by performing car services for Uber's users/customers as they were dispatched by Uber and by satisfying all of Uber's requirements for receiving a month's Guarantee Payout as described herein.

103.    Defendant's promise to pay the Guarantee Payout was the bargained-for exchange and induced Plaintiffs and the Class to enter into a contractual relationship with Defendant by their performance.

104.    Defendant's failure to pay Plaintiffs and the Class as promised constitutes material breach of such unilateral contract.

105.    Plaintiffs and the Class members have been damaged by Defendant's actions and are entitled to be compensated for resulting damages.

## COUNT II

## PROMISSORY ESTOPPEL

106.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

107.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against Defendant.

108.    Defendant made a promise to Plaintiffs and the Class in the terms and conditions of the Program, that if Plaintiffs and the Class met all the requirements set forth for each month, they were entitled to receive the Guarantee Payout for that month.

109.    Defendant's promise was intended to induced Plaintiffs and the Class's reliance.

110.    Defendant's promise did in fact induce Plaintiffs and the Class's reliance.

111.    Plaintiffs and the Class's reliance was foreseeable.

112.    Plaintiffs and the Class's reliance was detrimental.

113.    As such, Plaintiffs and the Class are entitled to reliance damages.

## COUNT III

## NEGLIGENT MISREPRESENTATION

114.    Plaintiffs and the Class members incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

115.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against Defendant.

116.    Defendant, directly or through their agents and employees, made false representations, concealments, and nondisclosures to Plaintiffs and the Class members.

117.    In making the representations of fact to Plaintiffs and the Class members,

28

Defendant failed to fulfill its duties to disclose the material fact that it had intended to disqualify participants for reasons not stated in the terms and conditions of the Program nor anywhere else in the world. The direct and proximate cause of this failure to disclose was Defendant's negligence.

118.    There was privity between Defendant and Plaintiffs and the Class members because Defendant entered into a contractual relationship or employer/employee relationship with Plaintiffs and the Class members.

119.    Defendants, in making the misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the representations were not true. Defendants made and intended the misrepresentations to induce the reliance of Plaintiffs and members of the Class.

120.    Plaintiffs and members of the Class relied upon these false representations and nondisclosures and were injured.

121.    As a result of Defendants' wrongful conduct, Plaintiffs and members of the Class have suffered economic losses and other general and specific damages, and any interest that would have been accrued on those monies, all in an amount to be determined according to proof at time of trial.

## COUNT IV

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

122.    Plaintiffs and the Class members incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

123.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Class against Defendant.

124.    Every contract contains an implied covenant of good faith and fair dealing. The

implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

125.    Defendant breached the covenant of good faith and fair dealing by, *inter alia*, disqualifying Plaintiffs and the Class for reasons not stated in the terms and conditions of the Program nor anywhere else in the world, and/or by retroactively and unilaterally adding an additional requirement while it knew or should have known that Plaintiffs and the Class could not satisfy the added requirement (i) due to Defendant's failure to provide notice as to such changed terms and (ii) the additional requirement directly conflicted with other Program requirements.

126.    Defendant acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT V

## UNJUST ENRICHMENT

127.    Plaintiffs and the Class members incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein. This claim is plead in the alternative to the contract based claims.

128.    Plaintiffs and the Class members conferred a benefit on Defendant by signing up as an Uber driver and by performing car services and satisfying the requirements under the Program.

129.    Defendant had knowledge that this benefit was conferred upon them.

130.    However, Defendant breached the contract by failing to pay Plaintiffs and the Class the Guarantee Payout even though they had satisfied all Defendant's requirements. Such breaches of the agreement have caused the Class millions of dollars in damages.

131.    Defendant has been unjustly enriched at the expense of Plaintiffs and the Class

members, and their retention of this benefit under the circumstances would be inequitable. Defendant should be required to make restitution.

**COUNT VI**

**VIOLATION OF NEW YORK DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**

**N.Y. GBL § 349**

132.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

133.    Plaintiffs bring this claim individually and on behalf of the other members of the Class for Defendant's violations of NY GBL § 349.

134.    Defendant's business acts and practices and/or omissions alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

135.    The practices of Defendants described throughout this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, inter alia, one or more of the following reasons:

    a.  Defendant engaged in deceptive, unfair and unconscionable commercial practices in failing to reveal material facts and information, which did, or tended to, mislead Plaintiffs and the Class about facts that could not reasonably be known by them;

    b.  Defendant knowingly and falsely represented in the terms and conditions of the Program and email correspondence that the satisfaction of all the requirements therein would entitled Plaintiffs and the Class to the Guarantee Payout for a given month even though it would not;

31

c.  Defendant failed to reveal facts that were material to the transactions;

d.  Defendant caused Plaintiffs and the New York Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

e.  Defendant failed to reveal material facts to Plaintiffs and the Class with the intent that Plaintiffs and the Class members rely upon the omission;

f.  Defendant made material representations and statements of fact to Plaintiffs and the Class that resulted in Plaintiffs and the Class reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

g.  Defendant intended that Plaintiffs and the members of the Class rely on their misrepresentations and omissions.

136.  Under all of the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

137.  Defendant's actions impact the public interest because Plaintiffs and members of the Class were injured in exactly the same way as thousands of others working as Uber drivers as a result of and pursuant to Defendant's generalized course of deception.

138.  By committing the acts alleged in this Complaint, Defendant has misled Plaintiffs and the Class into believing that they would receive the Guarantee Payout had they satisfied all the requirements which constituted Defendant's offer under the Program. This is a deceptive business practice that violates NY GBL § 349.

139.  The foregoing deceptive acts, omissions and practices were consumer-oriented because they were neither private nor unique to the parties and had a broader impact on consumers

32

at large. By engaging in such deceptive acts, Defendant was able to operate at a lower cost and take away market share from its competitors and attract more consumers.

140.    The foregoing deceptive acts, omissions and practices set forth in connection with Defendants' violations of NY GBL § 349 proximately caused Plaintiffs and other members of the Class to suffer actual damages in the form of, *inter alia*, Guarantee Payout unpaid by Defendant. Plaintiffs and other members of the Class are entitled to recover such damages, together with equitable and declaratory relief, appropriate damages, including punitive damages, attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully requests that this Court:

A.      determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.      appoint Plaintiffs as the Class representative and their counsel as Class counsel;

C.      award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and the Class members are entitled;

D.      award pre-judgment and post-judgment interest on such monetary relief;

E.      grant appropriate injunctive and/or declaratory relief, including, without limitation, an order enjoining Defendant from disbursing, transferring or disposing of any assets including the payments received from the Class, requiring them to provide a full accounting with respect to Plaintiffs and Class members, and requiring Defendant to, at a minimum, pay Plaintiffs and Class members for the unpaid amounts of the Guarantee Payout;

33

F.      award reasonable attorneys' fees and costs; and

G.      grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: February 2, 2016                    Respectfully submitted,

                                           **LEE LITIGATION GROUP, PLLC**
                                           C.K. Lee (CL 4086)
                                           Anne Seelig (AS 1976)
                                           Shanshan Zheng (SZ 3301)
                                           30 East 39th Street, Second Floor
                                           New York, NY 10016
                                           Tel.: 212-465-1188
                                           Fax: 212-465-1181
                                           *Attorneys for Plaintiffs and the Class*

                            By: _____/s/ C.K. Lee_____
                                           C.K. Lee (CL 4086)

# EXHIBIT A



Select Language | ▼

UBER

CREATE AN ACCOUNT

HOME    LICENSE REQUIREMENTS    VEHICLE REQUIREMENTS    START DRIVING    SUPPORT

×

2015 GUARANTEE

Make $7,000 in net fares by the end of the year, guaranteed.

If you make less but meet the criteria, we will pay you the difference.

THE GUARANTEE DECREASES EACH MONTH BASED ON YOUR ACTIVATION DATE -- THE SOONER YOU START, THE GREATER THE EARNINGS!

| START DATE IS BEFORE | GUARANTEE |
|---|---|
| JULY 10 | $35,000 |
| AUGUST 10 | $30,000 |
| SEPTEMBER 10 | $25,000 |
| OCTOBER 10 | $20,000 |
| NOVEMBER 10 | $14,000 |

DECEMBER 10

# NO VEHICLE? *NO PROBLEM*

RENT OR FINANCE A VEHICLE

## NO TLC LICENSE? *THAT'S FINE*

GET A TLC LICENSE

$7,000

*TERMS AND CONDITIONS:*

Only new (never completed a trip prior to 5/18/15) partners in New York City are eligible for the guarantee.

New partners will be eligible for each month of the guarantee. If you do not hit the requirements for a given month, you will not earn that month's guarantee, but you will still be eligible for the next months' guarantees. To qualify for the guarantee in you must opt-in through the unique link provided in specific company communications. Monthly guarantee payments are subject to being withheld as deemed appropriate.

Only NYC partners driving uberX, uberXL, UberBLACK or UberSUV are eligible. This offer does not extend to New Jersey, Long Island, Westchester, Connecticut, or uberT partners.

This guarantee is for net fares. Net fares is defined as all money received in trips (including cancelation fees) minus Uber's Service Fee, Sales Tax and Black Car Fund fees. Miscellaneous deductions such as vehicle payments, phone data fees and device deposits are not included in this net : this guarantee is before those deductions. Net fares are just like "Driver Earnings" on your payment statement, except that for this guarantee it's based on a month instead of by week:

## Your Name : Payment Statement



| DRIVER EARNINGS | MISCELLANEOUS | TOTAL PAYOUT |
|---|---|---|
| $ | = | $ |

Payouts will be made the first week of each month. Partners' accounts must still be active on that date to be eligible.

In order to qualify for a given month's guarantee, you must:

# FREQUENTLY ASKED QUESTIONS AND EXAMPLE CALCULATIONS

1. Accept 90% of trips in that month
2. Be online for at least 200 hours in that month
3. Complete at least 200 trips in that month (only NYC trips count towards this total)
4. Complete at least 1 trip per hour

| TYPE | DEFINITION | EXAMPLE 1 | EXAMPLE 2 |
|---|---|---|---|
| FARES | Base Fare, Time and Distance | $3,500 | $4,800 |
| SURGE | | $300 | $300 |
| CANCELLATIONS | | $200 | $400 |
| TOLLS & SURCHARGES | | $0 | $100 |
| GROSS FARES | Fares + Cancellations + Surge + Tolls | $4,000 | $5,500 |
| UBER'S SERVICE FEE | 25% of Fares + Surge + Cancellations | $1,000 | $1,550 |
| SALES TAX | 8.15% of Gross Fares | $326 | $449 |
| BLACK CAR FUND FEE | 2.25% of Gross Fares | $90 | $121.50 |
| NET FARES | Gross Fares - Uber's Service Fee - Sales Tax - Black Car Fund | $2,584 | $3,588.40 |
| GUARANTEE PAYOUT IN MONTH WITH $5,000 GUARANTEE | | $2,416 | $1,411.60 |

- **How will I know how I am doing?**

  o We'll send you an email in the middle of the month letting you know how many hours and trips you've done so far month-to-date.

  o You can also see how you're doing by looking at your weekly Driver Earnings every week (see above screenshot). Remember that the guarantee is based on calendar months, not weeks (weeks may include days that aren't counted in the month). That said, your weekly driver earnings will still give you a good sense of how you're doing so far for the month.

- **If I don't meet the qualifications one month and therefore don't get the guarantee, can I still get it for other months?**

  Yes! We'll look at each month individually. If you didn't get July, you can still get August - December!

- **I used to work uberT /NJ/ CONN, but now I am uberX in New York City. Am I eligible?**
  - Yes, as long as you have never completed uberX trip in New York City before May 18, you are eligible.

- **I became active before May 18th but took my first trip after May 18. Am I still eligible?**
  - Yes. Eligibility is determined by the date of your first trip, not the date of activation.

- **I was an active partner in early 2014, but then I deleted my account and am now driving again. Am I eligible?**
  - No. Anyone who has completed a trip prior to May 18, 2015 is not eligible

- **I added up four weeks of "Driver Earnings" and it didn't match my monthly earnings.**
  - Since the guarantee is based on the month, and your payments are based on a week (that might overlap two months,) you can use "Driver Earnings" to get a very good sense of where you're at, but it might not match up perfectly.

- **When do I get paid?**
  - You'll see the payments on your statements on partners.uber.com the first Monday of every month. Deposits will be the subsequent Thursdays
    - August 3 (for July)
    - September 7 (for August)
    - October 5 (for September)
    - November 2 (for October)
    - December 7 (for November)
    - January 4 (for December)

- **I didn't get any guarantee.**
  - It's possible that you didn't meet the requirements for the month or that you earned the guaranteed amount on your own.

- **I got my guarantee payment, but I got less than the amount I expected.**
  - Feel free to use the example table above to help you calculate your earnings. If you were subtracting device fee and vehicle payments from your net fares, remember that these are not included. If you're unsure, email partners-NY@uber.com and we'll be happy to walk you through it.

Privacy Policy and Terms and Conditions

Location & Contact

# EXHIBIT B

# LEGAL

## TERMS AND CONDITIONS

Last Updated: January 2, 2016

| UNITED STATES | ☐ |

## 1. CONTRACTUAL RELATIONSHIP

These Terms of Use ("*Terms*") govern the access or use by you, an individual, from within the United States and its territories and possessions of applications, websites, content, products, and services (the "*Services*") made available in the United States and its

territories and possessions by Uber USA, LLC and its subsidiaries and affiliates (collectively, "*Uber*"). PLEASE READ THESE TERMS CAREFULLY BEFORE ACCESSING OR USING THE SERVICES. In these Terms, the words "including" and "include" mean "including, but not limited to."

Your access and use of the Services constitutes your agreement to be bound by these Terms, which establishes a contractual relationship between you and Uber. If you do not agree to these Terms, you may not access or use the Services. These Terms expressly supersede prior agreements or arrangements with you. Uber may immediately terminate these Terms or any Services with respect to you, or generally cease offering or deny access to the Services or any portion thereof, at any time for any reason.

Supplemental terms may apply to certain Services, such as policies for a particular event, activity or promotion, and such supplemental terms will be disclosed to you in region-specific disclosures (e.g., a particular city webpage on Uber.com) or in connection with the applicable Service(s). Supplemental terms are in addition to, and shall be deemed a part of, the Terms for the purposes of the applicable Service(s). Supplemental terms shall prevail over these Terms in the event of a conflict with respect to the applicable Services.

Uber may amend the Terms related to the Services from time to time. Amendments will be effective upon Uber's posting of such updated Terms at this location or the amended policies or supplemental terms on the applicable Service(s). Your continued access or use of the Services after such posting constitutes your consent to be bound by the Terms, as amended.

Our collection and use of personal information in connection with the Services is as provided in Uber's Privacy Policy located at www.uber.com/legal/usa/privacy (/legal/usa/privacy).

## 2. THE SERVICES

The Services constitute a technology platform that enables users of Uber's mobile applications or websites provided as part of the Services (each, an "*Application*") to arrange and schedule transportation and/or logistics services with third party providers of such services, including independent third party transportation providers and third party logistics providers under agreement with Uber or certain of Uber's affiliates ("*Third Party Providers*"). Unless otherwise agreed by Uber in a separate written agreement with you, the Services are made available solely for your personal, noncommercial use. YOU ACKNOWLEDGE THAT UBER DOES NOT PROVIDE TRANSPORTATION OR LOGISTICS SERVICES OR FUNCTION AS A TRANSPORTATION CARRIER.

## LICENSE.

Subject to your compliance with these Terms, Uber grants you a limited, non-exclusive, non-sublicensable, revocable, non-transferrable license to: (i) access and use the Applications on your personal device solely in connection with your use of the Services; and (ii) access and use any content, information and related materials that may be made available through the Services, in each case solely for your personal, noncommercial use. Any rights not expressly granted herein are reserved by Uber and Uber's licensors.

## RESTRICTIONS.

You may not: (i) remove any copyright, trademark or other proprietary notices from any portion of the Services; (ii) reproduce, modify, prepare derivative works based upon, distribute, license, lease, sell, resell, transfer, publicly display, publicly perform, transmit, stream, broadcast or otherwise exploit the Services except as expressly permitted by Uber; (iii) decompile, reverse engineer or disassemble the Services except as may be permitted by applicable law; (iv) link to, mirror or frame any portion of the Services; (v) cause or launch any programs or scripts for the purpose of scraping, indexing, surveying, or otherwise data mining any portion of the Services or unduly burdening or hindering the operation and/or functionality of any aspect of the Services; or (vi) attempt to gain unauthorized access to or impair any aspect of the Services or its related systems or networks.

## PROVISION OF THE SERVICES.

You acknowledge that portions of the Services may be made available under Uber's various brands or request options associated with transportation or logistics, including the transportation request brands currently referred to as "Uber," "uberX," "uberXL," "UberBLACK," "UberSUV," and "UberLUX" and the logistics request brands currently referred to as "UberRUSH," "UberFRESH" and "UberEATS". You also acknowledge that the Services may be made available under such brands or request options by or in connection with: (i) certain of Uber's subsidiaries and affiliates; or (ii) independent Third Party Providers, including Transportation Network Company drivers, Transportation Charter Permit holders or holders of similar transportation permits, authorizations or licenses.

## THIRD PARTY SERVICES AND CONTENT.

The Services may be made available or accessed in connection with third party services and content (including advertising) that Uber does not control. You acknowledge that different terms of use and privacy policies may apply to your use of such third party services and content. Uber does not endorse such third party services and content and in no event shall Uber be responsible or liable for any products or services of such third party providers. Additionally, Apple Inc., Google, Inc., Microsoft Corporation or BlackBerry Limited will be a third-party beneficiary to this contract if you access the Services using Applications developed for Apple iOS, Android, Microsoft Windows, or Blackberry-powered mobile devices,

respectively. These third party beneficiaries are not parties to this contract and are not responsible for the provision or support of the Services in any manner. Your access to the Services using these devices is subject to terms set forth in the applicable third party beneficiary's terms of service.

OWNERSHIP.

The Services and all rights therein are and shall remain Uber's property or the property of Uber's licensors. Neither these Terms nor your use of the Services convey or grant to you any rights: (i) in or related to the Services except for the limited license granted above; or (ii) to use or reference in any manner Uber's company names, logos, product and service names, trademarks or services marks or those of Uber's licensors.

# 3. YOUR USE OF THE SERVICES

USER ACCOUNTS.

In order to use most aspects of the Services, you must register for and maintain an active personal user Services account ("*Account*"). You must be at least 18 years of age, or the age of legal majority in your jurisdiction (if different than 18), to obtain an Account. Account registration requires you to submit to Uber certain personal information, such as your name, address, mobile phone number and age, as well as at least one valid payment method

(either a credit card or accepted payment partner). You agree to maintain accurate, complete, and up-to-date information in your Account. Your failure to maintain accurate, complete, and up-to-date Account information, including having an invalid or expired payment method on file, may result in your inability to access and use the Services or Uber's termination of this Agreement with you. You are responsible for all activity that occurs under your Account, and you agree to maintain the security and secrecy of your Account username and password at all times. Unless otherwise permitted by Uber in writing, you may only possess one Account.

USER REQUIREMENTS AND CONDUCT.

The Service is not available for use by persons under the age of 18. You may not authorize third parties to use your Account, and you may not allow persons under the age of 18 to receive transportation or logistics services from Third Party Providers unless they are accompanied by you. You may not assign or otherwise transfer your Account to any other person or entity. You agree to comply with all applicable laws when using the Services, and you may only use the Services for lawful purposes (e.g., no transport of unlawful or hazardous materials). You will not in your use of the Services cause nuisance, annoyance, inconvenience, or property damage, whether to the Third Party Provider or any other party. In certain instances you may be asked to provide proof of

identity to access or use the Services, and you agree that you may be denied access to or use of the Services if you refuse to provide proof of identity.

TEXT MESSAGING.

By creating an Account, you agree that the Services may send you informational text (SMS) messages as part of the normal business operation of your use of the Services. You may opt-out of receiving text (SMS) messages from Uber at any time by texting the word STOP to 89203 from the mobile device receiving the messages. You acknowledge that opting out of receiving text (SMS) messages may impact your use of the Services.

PROMOTIONAL CODES.

Uber may, in Uber's sole discretion, create promotional codes that may be redeemed for Account credit, or other features or benefits related to the Services and/or a Third Party Provider's services, subject to any additional terms that Uber establishes on a per promotional code basis ("*Promo Codes*"). You agree that Promo Codes: (i) must be used for the intended audience and purpose, and in a lawful manner; (ii) may not be duplicated, sold or transferred in any manner, or made available to the general public (whether posted to a public form or otherwise), unless expressly permitted by Uber; (iii) may be disabled by Uber at any time for any reason without liability to Uber; (iv) may only be used pursuant to the specific terms that Uber establishes for such Promo Code; (v) are

not valid for cash; and (vi) may expire prior to your use. Uber reserves the right to withhold or deduct credits or other features or benefits obtained through the use of Promo Codes by you or any other user in the event that Uber determines or believes that the use or redemption of the Promo Code was in error, fraudulent, illegal, or in violation of the applicable Promo Code terms or these Terms.

## USER PROVIDED CONTENT.

Uber may, in Uber's sole discretion, permit you from time to time to submit, upload, publish or otherwise make available to Uber through the Services textual, audio, and/or visual content and information, including commentary and feedback related to the Services, initiation of support requests, and submission of entries for competitions and promotions ("*User Content*"). Any User Content provided by you remains your property. However, by providing User Content to Uber, you grant Uber a worldwide, perpetual, irrevocable, transferrable, royalty-free license, with the right to sublicense, to use, copy, modify, create derivative works of, distribute, publicly display, publicly perform, and otherwise exploit in any manner such User Content in all formats and distribution channels now known or hereafter devised (including in connection with the Services and Uber's business and on third-party sites and services), without further notice to or consent from you, and without the requirement of payment to you or any other person or entity.

You represent and warrant that: (i) you either are the sole and exclusive owner of all User Content or you have all rights, licenses, consents and releases necessary to grant Uber the license to the User Content as set forth above; and (ii) neither the User Content nor your submission, uploading, publishing or otherwise making available of such User Content nor Uber's use of the User Content as permitted herein will infringe, misappropriate or violate a third party's intellectual property or proprietary rights, or rights of publicity or privacy, or result in the violation of any applicable law or regulation.

You agree to not provide User Content that is defamatory, libelous, hateful, violent, obscene, pornographic, unlawful, or otherwise offensive, as determined by Uber in its sole discretion, whether or not such material may be protected by law. Uber may, but shall not be obligated to, review, monitor, or remove User Content, at Uber's sole discretion and at any time and for any reason, without notice to you.

NETWORK ACCESS AND DEVICES.

You are responsible for obtaining the data network access necessary to use the Services. Your mobile network's data and messaging rates and fees may apply if you access or use the Services from a wireless-enabled device. You are responsible for acquiring and updating compatible hardware or devices necessary

to access and use the Services and Applications and any updates thereto. Uber does not guarantee that the Services, or any portion thereof, will function on any particular hardware or devices. In addition, the Services may be subject to malfunctions and delays inherent in the use of the Internet and electronic communications.

## 4. PAYMENT

You understand that use of the Services may result in charges to you for the services or goods you receive from a Third Party Provider ("*Charges*"). After you have received services or goods obtained through your use of the Service, Uber will facilitate your payment of the applicable Charges on behalf of the Third Party Provider, as such Third Party Provider's limited payment collection agent. Payment of the Charges in such manner shall be considered the same as payment made directly by you to the Third Party Provider. Charges will be inclusive of applicable taxes where required by law. Charges paid by you are final and non-refundable, unless otherwise determined by Uber. You retain the right to request lower Charges from a Third Party Provider for services or goods received by you from such Third Party Provider at the time you receive such services or goods. Uber will respond accordingly to any request from a Third Party Provider to modify the Charges for a particular service or good.

All Charges are due immediately and payment will be facilitated by Uber using the preferred payment method designated in your Account, after which Uber will send you a receipt by email. If your primary Account payment method is determined to be expired, invalid or otherwise not able to be charged, you agree that Uber may, as the Third Party Provider's limited payment collection agent, use a secondary payment method in your Account, if available.

As between you and Uber, Uber reserves the right to establish, remove and/or revise Charges for any or all services or goods obtained through the use of the Services at any time in Uber's sole discretion. Further, you acknowledge and agree that Charges applicable in certain geographical areas may increase substantially during times of high demand. Uber will use reasonable efforts to inform you of Charges that may apply, provided that you will be responsible for Charges incurred under your Account regardless of your awareness of such Charges or the amounts thereof. Uber may from time to time provide certain users with promotional offers and discounts that may result in different amounts charged for the same or similar services or goods obtained through the use of the Services, and you agree that such promotional offers and discounts, unless also made available to you, shall have no bearing on your use of the Services or the Charges applied to you. You may elect to cancel your request for services or goods from a Third Party Provider at any time prior to such Third Party Provider's arrival, in which case you may be charged a cancellation fee.

This payment structure is intended to fully compensate the Third Party Provider for the services or goods provided. Except with respect to taxicab transportation services requested through the Application, Uber does not designate any portion of your payment as a tip or gratuity to the Third Party Provider. Any representation by Uber (on Uber's website, in the Application, or in Uber's marketing materials) to the effect that tipping is "voluntary," "not required," and/or "included" in the payments you make for services or goods provided is not intended to suggest that Uber provides any additional amounts, beyond those described above, to the Third Party Provider. You understand and agree that, while you are free to provide additional payment as a gratuity to any Third Party Provider who provides you with services or goods obtained through the Service, you are under no obligation to do so. Gratuities are voluntary. After you have received services or goods obtained through the Service, you will have the opportunity to rate your experience and leave additional feedback about your Third Party Provider.

REPAIR OR CLEANING FEES.

You shall be responsible for the cost of repair for damage to, or necessary cleaning of, Third Party Provider vehicles and property resulting from use of the Services under your Account in excess of normal "wear and tear" damages and necessary cleaning ("*Repair or Cleaning*"). In the event that a Third Party Provider reports the need for Repair or Cleaning, and such Repair or Cleaning request is

☐ MENU

verified by Uber in Uber's reasonable discretion, Uber reserves the right to facilitate payment for the reasonable cost of such Repair or Cleaning on behalf of the Third Party Provider using your payment method designated in your Account. Such amounts will be transferred by Uber to the applicable Third Party Provider and are non-refundable.

# 5. DISCLAIMERS; LIMITATION OF LIABILITY; INDEMNITY.

DISCLAIMER.

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD-PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD

SIGN UP (/SIGN-UP)

REQUESTED IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

LIMITATION OF LIABILITY.

UBER SHALL NOT BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, LOST DATA, PERSONAL INJURY, OR PROPERTY DAMAGE RELATED TO, IN CONNECTION WITH, OR OTHERWISE RESULTING FROM ANY USE OF THE SERVICES, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR ANY DAMAGES, LIABILITY OR LOSSES ARISING OUT OF: (i) YOUR USE OF OR RELIANCE ON THE SERVICES OR YOUR INABILITY TO ACCESS OR USE THE SERVICES; OR (ii) ANY TRANSACTION OR RELATIONSHIP BETWEEN YOU AND ANY THIRD PARTY PROVIDER, EVEN IF UBER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. UBER SHALL NOT BE LIABLE FOR DELAY OR FAILURE IN PERFORMANCE RESULTING FROM CAUSES BEYOND UBER'S REASONABLE CONTROL. YOU ACKNOWLEDGE THAT THIRD PARTY TRANSPORTATION PROVIDERS PROVIDING TRANSPORTATION SERVICES REQUESTED THROUGH SOME REQUEST BRANDS MAY OFFER RIDESHARING OR PEER-TO-PEER TRANSPORTATION SERVICES AND MAY NOT BE PROFESSIONALLY LICENSED OR PERMITTED. IN NO EVENT SHALL UBER'S TOTAL

LIABILITY TO YOU IN CONNECTION WITH THE SERVICES FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION EXCEED FIVE HUNDRED U.S. DOLLARS (US $500).

UBER'S SERVICES MAY BE USED BY YOU TO REQUEST AND SCHEDULE TRANSPORTATION, GOODS, OR LOGISTICS SERVICES WITH THIRD PARTY PROVIDERS, BUT YOU AGREE THAT UBER HAS NO RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY TRANSPORTATION, GOODS OR LOGISTICS SERVICES PROVIDED TO YOU BY THIRD PARTY PROVIDERS OTHER THAN AS EXPRESSLY SET FORTH IN THESE TERMS.

THE LIMITATIONS AND DISCLAIMER IN THIS SECTION 5 DO NOT PURPORT TO LIMIT LIABILITY OR ALTER YOUR RIGHTS AS A CONSUMER THAT CANNOT BE EXCLUDED UNDER APPLICABLE LAW.

INDEMNITY.

You agree to indemnify and hold Uber and its officers, directors, employees, and agents harmless from any and all claims, demands, losses, liabilities, and expenses (including attorneys' fees), arising out of or in connection with: (i) your use of the Services or services or goods obtained through your use of the Services; (ii) your breach or violation of any of these Terms; (iii) Uber's use of your User Content; or (iv) your violation of the rights of any third party, including Third Party Providers.

# 6. DISPUTE RESOLUTION

ARBITRATION.

You agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services (collectively, "*Disputes*") will be settled by binding arbitration between you and Uber, except that each party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. You acknowledge and agree that you and Uber are each waiving the right to a trial by jury or to participate as a plaintiff or class in any purported class action or representative proceeding. Further, unless both you and Uber otherwise agree in writing, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of any class or representative proceeding. If this specific paragraph is held unenforceable, then the entirety of this "Dispute Resolution" section will be deemed void. Except as provided in the preceding sentence, this "Dispute Resolution" section will survive any termination of these Terms.

ARBITRATION RULES AND GOVERNING LAW.

The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the "AAA *Rules*") then in effect, except as modified by this "Dispute Resolution" section. (The AAA Rules are available at www.adr.org/arb_med (http://www.adr.org/arb_med) or by calling the AAA at 1-800-778-7879.) The Federal Arbitration Act will govern the interpretation and enforcement of this Section.

ARBITRATION PROCESS.

A party who desires to initiate arbitration must provide the other party with a written Demand for Arbitration as specified in the AAA Rules. (The AAA provides a form Demand for Arbitration at www.adr.org/aaa/ShowPDF?doc=ADRSTG_004175 (http://www.adr.org/aaa/ShowPDF?doc=ADRSTG_004175) and a separate form for California residents at www.adr.org/aaa/ShowPDF?doc=ADRSTG_015822 (http://www.adr.org/aaa/ShowPDF?doc=ADRSTG_015822).) The arbitrator will be either a retired judge or an attorney licensed to practice law in the state of California and will be selected by the parties from the AAA's roster of consumer dispute arbitrators. If the parties are unable to agree upon an arbitrator within seven (7) days of delivery of the Demand for Arbitration, then the AAA will appoint the arbitrator in accordance with the AAA Rules.

ARBITRATION LOCATION AND PROCEDURE.

Unless you and Uber otherwise agree, the arbitration will be conducted in the county where you reside. If your claim does not exceed $10,000, then the arbitration will be conducted solely on the basis of documents you and Uber submit to the arbitrator, unless you request a hearing or the arbitrator determines that a hearing is necessary. If your claim exceeds $10,000, your right to a hearing will be determined by the AAA Rules. Subject to the AAA Rules, the arbitrator will have the discretion to direct a reasonable exchange of information by the parties, consistent with the expedited nature of the arbitration.

ARBITRATOR'S DECISION.

The arbitrator will render an award within the time frame specified in the AAA Rules. The arbitrator's decision will include the essential findings and conclusions upon which the arbitrator based the award. Judgment on the arbitration award may be entered in any court having jurisdiction thereof. The arbitrator's award damages must be consistent with the terms of the "Limitation of Liability" section above as to the types and the amounts of damages for which a party may be held liable. The arbitrator may award declaratory or injunctive relief only in favor of the claimant and only to the extent necessary to provide relief warranted by the claimant's individual claim. If you prevail in arbitration you will be entitled to an award of attorneys' fees and expenses, to the extent

provided under applicable law. Uber will not seek, and hereby waives all rights Uber may have under applicable law to recover, attorneys' fees and expenses if Uber prevail in arbitration.

FEES.

Your responsibility to pay any AAA filing, administrative and arbitrator fees will be solely as set forth in the AAA Rules. However, if your claim for damages does not exceed $75,000, Uber will pay all such fees unless the arbitrator finds that either the substance of your claim or the relief sought in your Demand for Arbitration was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)).

CHANGES.

Notwithstanding the provisions of the modification-related provisions above, if Uber changes this "Dispute Resolution" section after the date you first accepted these Terms (or accepted any subsequent changes to these Terms), you may reject any such change by providing Uber written notice of such rejection by mail or hand delivery to: Uber USA, LLC, Attn: Dispute Resolutions, 160 Greentree Drive, Suite 101, Dover, DE 19904, or by email from the email address associated with your Account to: change-dr@uber.com (mailto:change-dr@uber.com), within 30 days of the date such change became effective, as indicated in the "Last update" date above. In order to be effective, the notice must include your

full name and clearly indicate your intent to reject changes to this "Dispute Resolution" section. By rejecting changes, you are agreeing that you will arbitrate any Dispute between you and Uber in accordance with the provisions of this "Dispute Resolution" section as of the date you first accepted these Terms (or accepted any subsequent changes to these Terms).

# 7. OTHER PROVISIONS

## CHOICE OF LAW.

These Terms are governed by and construed in accordance with the laws of the State of California, U.S.A., without giving effect to any conflict of law principles, except as may be otherwise provided in supplemental terms applicable to your region.

## CLAIMS OF COPYRIGHT INFRINGEMENT.

Claims of copyright infringement should be sent to Uber's designated agent. Please visit Uber's web page at www.uber.com/legal/usa/copyright (/legal/usa/copyright) for the designated address and additional information.

## NOTICE.

Uber may give notice by means of a general notice on the Services, electronic mail to your email address in your Account, or by written communication sent by first class mail or pre-paid post to your

DOWNLOAD UBER (/APP)

address in your Account. Such notice shall be deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or 12 hours after sending (if sent by email). You may give notice to Uber, with such notice deemed given when received by Uber, at any time by first class mail or pre-paid post to Uber USA, LLC, Attn: User Notices - Legal, 160 Greentree Drive, Suite 101, Dover, DE 19904.

## GENERAL.

You may not assign these Terms without Uber's prior written approval. Uber may assign these Terms without your consent to: (i) a subsidiary or affiliate; (ii) an acquirer of Uber's equity, business or assets; or (iii) a successor by merger. Any purported assignment in violation of this section shall be void. No joint venture, partnership, employment, or agency relationship exists between you, Uber or any Third Party Provider as a result of this Agreement or use of the Services. If any provision of these Terms is held to be invalid or unenforceable, such provision shall be struck and the remaining provisions shall be enforced to the fullest extent under law. Uber's failure to enforce any right or provision in these Terms shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing.

SIGN UP FOR UBER (/SIGN-UP)

HOME (/)   •   CITIES (/CITIES)   •
DRIVE
(//PARTNERS.UBER.COM/DRIVE)

HELP CENTER (//HELP.UBER.COM)   CAREERS
(/JOBS)   DEVELOPERS (//DEVELOPER.UBER.COM)

NEWSROOM (//BLOG.UBER.COM)   ABOUT US
(/ABOUT)

ENGLISH

TERMS AND CONDITIONS (/LEGAL/TERMS)
PRIVACY POLICY (/LEGAL/PRIVACY/USERS)

☐ (https://www.facebook.com/uber)

(https://twitter.com/uber)
☐

(http://www.linkedin.com/company/1815218)
☐

(https://instagram.com/uber/)
☐

# EXHIBIT C

# LEE LITIGATION GROUP, PLLC
30 EAST 39TH STREET, SECOND FLOOR
NEW YORK, NY 10016
TEL: 212-465-1180
FAX: 212-465-1181
INFO@LEELITIGATION.COM

WRITER'S DIRECT:     212-465-1188
                     cklee@leelitigation.com

February 1, 2016

*VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED*

Legal Department
Uber Technologies, Inc.
1455 Market Street
San Francisco, CA 94103

To Whom It May Concern:

We are counsel to Kai Peng, Saizhang Guan, and Longbin Li (the "Clients"). This letter shall serve as notice that my Clients hereby opt out of the Arbitration Provision in the driver-partner agreement and any other arbitration provision provided on www.uber.com.

Please direct any and all future correspondence to the Clients to my firm's attention.

Very truly yours,

C.K. Lee, Esq.

# EXHIBIT D

# LEE LITIGATION GROUP, PLLC

30 EAST 39TH STREET, SECOND FLOOR
NEW YORK, NY 10016
TEL: 212-465-1180
FAX: 212-465-1181
INFO@LEELITIGATION.COM

WRITER'S DIRECT:       212-465-1188
cklee@leelitigation.com

February 2, 2016

_**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**_

Legal Department
Uber Technologies, Inc.
1455 Market Street
San Francisco, CA 94103

To Whom It May Concern:

    We are counsel to Kai Peng, Saizhang Guan, and Longbin Li (the "Clients"). This letter shall serve as notice that my Clients have filed a Complaint (attached hereto) against your company.

    This letter shall serve as notice that you must immediately retain all documents (including electronic mail and website pages) that may relate to this lawsuit.

    In addition, you must immediately stop all correspondences with my Clients and direct all correspondences to me. Specifically, all future payments to the Clients must be directed to my firm, and not be made by direct deposit.

Very truly yours,

C.K. Lee, Esq.