**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

KAI PENG, SAIZHANG GUAN and LONGBIN LI,
*on behalf of themselves and the Class,*

                       Plaintiffs,

            v.

UBER TECHNOLOGIES, INC.,

                       Defendant.

Case No. 16-cv-0545 (SJ) (RER)

---

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION TO COMPEL ARBITRATION

C. K. Lee, Esq. (CL 4086)
Shanshan Zheng, Esq. (SZ 3301)
**LEE LITIGATION GROUP, PLLC**
30 East 39th Street, Second Floor
New York, NY 10016
Tel: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiffs and*
*the Class*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................II

TABLE OF AUTHORITIES ................................................................................................... IV

I.   UBER'S ARBITRATION AGREEMENTS ARE PROCEDURALLY AND
     SUBSTANTIVELY UNCONSCIONABLE ........................................................................ 1

     A    The December 2015 Services Agreement Is Procedurally Unconscionable ............................ 2

     B.   The December 2015 Services Agreement Is Substantively Unconscionable............................ 3

     C.   The December 2015 Services Agreement Is Misleading, Vague and Legally Invalid .............. 4

II.  FACTS SUPPORTING THAT PLAINTIFFS ARE NON-ENGLISH SPEAKERS .................... 6

III. DEFENDANTS FAILED TO ESTABLISH ASSENT TO THE DECEMBER 2015 SERVICES
     AGREEMENT .......................................................................................................... 7

     A.   Defendant Has the Burden of Establishing Assent ................................................ 7

     B.   Defendant Failed to Establish Assent Under the Reasonable Communicative Test .................. 8

          a.   The Design and Content of the Uber Driver App Does Not Encourage Drivers to Examine
               the Terms ................................................................................................. 8

     C.   Defendant Failed to Establish Assent with Respect to the Named Plaintiffs............................ 11

          a.   The Exception to the Duty to Read Rule under New York Contract Law Applies.............. 12

          b.   The Services Agreements Are Form Contracts ............................................... 13

          c.   The Doctrine of Constructive or Inquiry Notice Should Not Be Based on Manifestations
               Which the Offeror Did Not Reasonably Understand to Constitute Assent ........................... 14

IV.  THE ARBITRATION CLAUSE IN THE DECEMBER 2015 AGREEMENT DOES NOT
     APPLY RETROACTIVELY ........................................................................................ 16

V.   THE ARBITRATION PROVISION UNDER THE APRIL 2015 AGREEMENT IS
     UNENFORCEABLE.................................................................................................. 17

VI.  THE ARBITRATION PROVISION UNDER THE DECEMBER 2015 AGREEMENT IS
     UNENFORCEABLE.................................................................................................. 18

     A.   The Gateway Issue of Arbitrability Should Be Decided by the Court ...................................... 18

          a.   The Delegation Clause Does Not Cover Challenges to the Enforceability of the Agreement
               as a Whole ................................................................................................. 18

b.    The Delegation Clause Is Unenforceable on Grounds of Lack of Assent and Unconscionability ................................................................................................ 20

i.    The Delegation Clause in the December 2015 Arbitration Provision is Procedurally Unconscionable ................................................................................................ 20

ii.    The Delegation Clause in the December 2015 Arbitration Provision is Substantively Unconscionable ................................................................................................ 22

*B.*    *The Gateway Issues Have Not Been Satisfied* ............................................................. 23

a.    Plaintiffs Did Not Assent to the December 2015 Arbitration Provision Because Plaintiffs Did Not Have Actual or Constructive Notice .................................................... 23

b.    Plaintiffs' Claims that Uber Breached the Unilateral Contract under the New York City 2015 Guarantee Program Falls Out of the Scope of the Service Agreements ...................... 24

**VII.**    **THE CLASS ACTION WAIVER IS UNENFORCEABLE** ................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ajamian v. Cantor CO2e, L.P.,* 203 Cal. App. 4th 771 (2012) ...................................................... 4

*Allstate Ins. Co. v. Roseboro*, 247 A.D.2d 379, 667 N.Y.S.2d 914 (App. Div. 1998)................................ 23

*AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643 (1986)................................. 18

*AT&T Mobility v. Concepcion*, 563 U.S. 333 (2011)........................................................................ 25

*Ball v. SFX Broad.*, 236 A.D.2d 158, 665 N.Y.S.2d 444 (App. Div. 1997) ................................... 3

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015)...........................................................passim

*BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 188 L. Ed. 2d 220 (2014) ............................... 18

*Circuit City Stores, Inc. v. Adams*, 279 F.3d 889 (9th Cir. 2002) ...................................................... 3

*Cole v. Burns Int'l Security Servs.*, 105 F.3d 1465 (9th Cir. 2014) ............................................... 4

*Connett v. Justus Enterprises of Kansas, Inc.*, 1989 U.S. Dist. LEXIS 3529, Civ. A. No. 87-1739- T, 1989 WL 47071 (D. Kan. March 21, 1989) ................................................................................ 17

*Damato v. Time Warner Cable, Inc.,* No. 13-CV-994 (ARR)(RML), 2013 U.S. Dist. LEXIS 107117 (E.D.N.Y. July 30, 2013)........................................................................................................ 22

*Dan Ryan Builders, Inc. v. Nelson*, 508 F. App'x 207 (4th Cir. 2013) ...................................... 3

*Delfingen US-Texas, L.P. v. Valenzuela*, 407 S.W.3d 791 (Tex. App. Feb. 6, 2013)................................ 15

*Desiderio v. Nat'l Assoc. of Sec. Dealers, Inc.,* 191 F.3d 198 (2d Cir. 1999)............................................ 22

*DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463 (2015) ...................................................................... 25

*Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002) ...................................................... 3

*Eaton v. Prior, Belmay and Vermont State Police,* No. 2011-276, 2012 Vt. 54 (2012) ............................ 24

*First Am. Int'l Bank v. Cmty's Bank*, No. 10 Civ. 3775 (PAE), 2012 U.S. Dist. LEXIS 136474, 2012 WL 4341740 (S.D.N.Y. Sept. 21, 2012)........................................................................................ 5

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)........ 18

*Fitz v. NCR Corp.*, 118 Cal. App. 4th 702 (2004).......................................................................... 3

*Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 94 S. Ct. 629, 38 L. Ed. 2d 583 (1974) ..........................................................................................................................................17

*George Washington University v. Scott*, 711 A.2d 1257 (D.C. Ct. App. 1998)..........................17

*Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126 (7th Cir. 1997) ............................3

*Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1 (1988)....................................................1

*Harriman Grp. v. Napolitano*, 213 A.D.2d 159, 623 N.Y.S.2d 224 (App. Div. 1995) ..............23

*Hendrick v. Brown & Root. Inc.*, 50 F. Supp.2d 527 (E.D.Va. 1999)....................................5, 16

*Hines v. Overstock.com,* 668 F. Supp. 2d 362 (E.D.N.Y.2009) *aff'd* 380 Fed. Appx. 22 (2d Cir. 2010)...15

*Hirsch v. Citibank, N.A.*, 542 F. App'x 35 (2d Cir. 2013)..........................................................13

*I. & I. Holding Corp. v. Gainsburg*, 276 N.Y. 427, 12 N.E.2d 532 (1938) ................................24

*In re Larney's Estate*, 148 Misc. 871, 876, 266 N.Y.S. 564 (N.Y. Sur. Ct. 1933)......................25

*Kanbar v. O'Melveny & Myers*, 849 F. Supp. 2d 902 (N.D. Cal. 2011)........................................4

*Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616 (3d Cir. 2009) ......................................................3

*Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc.*, 745 So. 2d 271 (Ala. 1999) ............17

*Lau v. Mercedes-Benz USA, LLC*, 11-CV-1940 MEJ, 2012 WL 370557 (N.D. Cal. Jan. 31, 2012)............4

*Lee v. Intelius Inc*., 737 F.3d 1254 (9th Cir. 2013) ......................................................................2

*Long v. Fid. Water Sys.*, NO. C-97-20118 RMW, 2000 U.S. Dist. LEXIS 7827 (N.D. Cal. May 24, 2000) .......................................................................................................................................16

*Lou v. Ma Labs., Inc.,* No. 12-cv-05409 WHA, 2013 WL 2156316 (N. D. Cal. May 17, 2013) ................4

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001)................23

*Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 115 S. Ct. 1212 (1995)..................5, 19

*McCarthy v. Am. Int'l Grp., Inc.,* 283 F.3d 121 (2d Cir. 2002) ...................................................5

*Merkin v. Vonage Am. Inc.,* No. 2:13-CV-08026-CAS, 2014 WL 457942 (C.D. Cal. Feb. 3, 2014)...........4

*Mohamed v. Uber Techs., Inc.,* 109 F. Supp. 3d 1185 (N.D. Cal. 2015) ....................1, 18, 20, 22

*Morris v. Snappy Car Rental, Inc.*, 637 N.E.2d 253 (N.Y. 1994)..........................................1, 20

*Natt v. White Sands Condominium*, 95 A.D.3d 848, 943 N.Y.S.2d 231 N.Y.A.D. 2 Dept., (2012). ............5

*Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171 (9th Cir. 2014)....................................................2

*O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547 (N.D. Cal. 2015)............................................1, 17

*Paine Webber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) .......................................................19

*Phillips v. Audio Active Ltd.,* 494 F.3d 378 (2d Cir. 2007)...................................................8, 23

*Preda v. New York Presbyterian Hosppital,* Docket No. 08-cv-10724 (S.D.N.Y.).....................................4

*Ramos v. Westlake Services LLC*, No. A141353 (Cali. Ct. App. Nov. 24, 2015).......................................16

*Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393 (2d Cir. 2004) ...................................................7

*Rent-A-Center W., Inc. v. Jackson,* 561 U.S. 63 (2010)............................................................20

*Resorb Networks, Inc. v. YouNow.com*, 2016 NY Slip Op 26112 (Sup. Ct.).............................................10

*Robert Stigwood Org., Ltd. v. Atl. Recording Corp.*, 83 A.D.2d 123, 126, 443 N.Y.S.2d 726 (App. Div. 1981)...........................................................................................................23

*Roberto Basulto v. Hialeah Automotive, Etc.*, NO. SC09-2358, 2014 WL 1057334 (Fla. 2014)...............16

*Rogers v. Comcast Corp.*, 341 F. Supp. 2d 42 (D. Mass. 2004) ...................................................5

*Salazar v. Citadel Comm'ns Corp.*, 90 P.3d 466 (N.M. 2004) .....................................................3

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) ...................................................8, 14

*Schneider v. Kingdom of Thail.*, 688 F.3d 68 (2d Cir. 2012)....................................................18

*SEC v. Alexander*, 2004 U.S. Dist. LEXIS 12001 (S.D.N.Y. June 28, 2004)..........................................24

*Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003) ............................18, 22

*Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 201 (E.D.N.Y. 2010) .........2

*Silva v. Cofresi*, Docket No. 13-cv-3200 (S.D.N.Y.)..............................................................4

*Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002)........................................passim

*State v. Wolowitz*, 96 A.D.2d 47 (N.Y. 2d Dep't 1983)............................................................2

*Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547 (S.D.N.Y. 2011)............................................25

*Tigue v. Commercial Life Ins. Co.,* 631 N.Y.S.2d 974 (4th Dep't 1995)............................................19

*Ting v. At&T*, 319 F.3d 1126 (9th Cir. 2003)....................................................................4

*Triarch Indus. v. Crabtree*, 158 S.W.3d 772 (Mo. banc 2005) ..................................................... 3

*Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770 (N.D. Ill. 2011) .......................... 15

*Washington v. William Morris Endeavor Entm't, LLC*, 2011 U.S. Dist. LEXIS 81346 (S.D.N.Y. July 20, 2011) ................................................................................................................. 1, 18, 21

*Weinberger v. Prestigiaco*, Docket No. 14-cv-6136 (S.D.N.Y.) .................................................. 4

*Zaborowski v. MHN Gov't Servs., Inc.*, 936 F. Supp. 2d 1145 (N.D. Cal. 2013) ......................... 4

**STATUTES**

9 U.S.C. § 2 .................................................................................................................................. 16

**TREATISES**

John D. Calamari, *Duty to Read—A Changing Concept*, 43 FORDHAM L. REV. 341 (1974) ............... 13

Juliet M. Moringiello, *Signals, Assent and Internet Contracting*, 57 Rutgers L. Rev. 1307 ....................... 7

Lauren E. Miller, *Breaking the Language Barrier: the Failure of the Objective Theory to Promote Fairness in Language-Barrier Contracting*, 43 INDIANA L. REV. 175 (2009) ................................... 14

Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change*, 9 L. & Soc'y Rev. 95 (1974) ......................................................................................................... 8

Michael I. Meyerson, *The Reunification of Contract Law: The Objective Theory of Consumer Form Contracts*, 47 U. MIAMI L. REV. 1263, 1265 (1993) ......................................................... 13

Wayne Barnes, *The Objective Theory of Contracts*, 76 U.CIN.L.REV. 1119 (2008). ............................. 13

Since 2013, Uber has provided a series of one-sided draconian arbitration agreements to its independent contractor drivers, each of which was invalidated for procedural and substantive unconcionability:

- July 2013 License & Online Services Agreement, plus addendum (invalidated under *Mohamed v. Uber Techs., Inc.,* 109 F. Supp. 3d 1185 (N.D. Cal. 2015)).
- June 2014 License & Online Services Agreement, plus addendum (invalidated under *Mohamed v. Uber Techs., Inc.,* 109 F. Supp. 3d 1185 (N.D. Cal. 2015)).
- June 2014 Rasier Software Sublicense & Online Services Agreement (invalidated under *Mohamed v. Uber Techs., Inc.,* 109 F. Supp. 3d 1185 (N.D. Cal. 2015)).
- November 2014 Rasier Software License & Online Services Agreement (invalidated under *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547 (N.D. Cal. 2015)).
- April 2015 Software License and Online Services Agreement, plus addendum (invalidated under *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547 (N.D. Cal. 2015)).

Each of the above agreements is attached hereto under the C.K. Lee Affidavit, Exhibits A-E. Each of the opinions referenced above are also attached under the C.K. Lee Affidavit, Exhibits F-G. The arbitration provision at issue here is contained in the December 2015 Technology Services Agreement, attached under the C.K. Lee Affidvait as Exhibit H.

Despite invalidation of the onerous procedural and substantive tactics utilized by Uber in the arbitration provision of the agreements to its drivers by various courts, Uber is still intent on effecting coercive and stress tactics to cause drivers to sign away their rights to a public trial.

I.      **Uber's Arbitration Agreements Are Procedurally and Substantively Unconscionable**

In determining whether an agreement is procedurally unconscionable, New York courts analyze factors such as the setting of the transaction, whether the party seeking to enforce the contract used high pressure tactics or deceptive language in the contract, whether there is inequality of bargaining power between the parties, and the experience and education of the party claiming unconscionability. *See Morris v. Snappy Car Rental, Inc.*, 637 N.E.2d 253, 256 (N.Y. 1994); *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 11 (1988); *Washington v. William Morris Endeavor Entm't, LLC*, 2011 U.S. Dist. LEXIS 81346, at *21-22 (S.D.N.Y. July 20, 2011). Procedural and substantive unconscionability have been described as operating on a "sliding scale," meaning that "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Shema Kolainu-Hear*

*Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 201 (E.D.N.Y. 2010) (citing *State v. Wolowitz*, 96

A.D.2d 47, 68 (N.Y. 2d Dep't 1983).  Similar to the other prior versions, the arbitration provision of the

December 2015 Services Agreement must similarly be invalidated.

**A.  The December 2015 Services Agreement Is Procedurally Unconscionable**

- Drivers did not receive proper notice of an arbitration agreement.  Defendant relies solely on electronic updates to pre-existing agreements that they delivered to Plaintiffs' mobile phones via links accompanying "I agree" boxes. Plaintiffs, who typically received a pop up on their cell phones while they were in the middle of a job or getting ready to drive to earn their livelihood, were compelled to click "I agree" in order to have access to the next passenger and to earn the next fare. The "I agree" boxes themselves included no notice regarding any arbitration provisions.  *See Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1177 (9th Cir. 2014) ("[W]here, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract."); *id.* at 1179 ("[E]ven close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."); *Lee v. Intelius Inc*., 737 F.3d 1254, 1257-60 (9th Cir. 2013) (holding no agreement to arbitrate was formed where defendants relied on an arbitration provision contained in a "'Terms and Conditions' hyperlink" presented on a website screen on which plaintiff clicked "Yes"); *Specht*, 306 F.3d at 21-22 (affirming denial of motion to compel arbitration where "plaintiffs acknowledge that when they proceeded to initiate installation of Communicator, they were automatically shown a scrollable text of that program's license agreement and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they accepted all the license terms.").

- Plaintiffs and numerous other Uber drivers are not fluent English speakers. Drivers use a multi-lingual platform of over 40 different native languages, while the December 2015 Services Agreement was delivered electronically exclusively in English, without translation. No driver ever received a paper copy of such agreement.

- Together, the April 2015 Services Agreement and December 2015 Services Agreement (both agreements which Plaintiffs were required to consent to in order to work) is over 30,000 words, longer than Charles Dickens' novel, *A Christmas Carol*, and is impossible to read on hand held mobile devices through which it was delivered, even if Uber drivers were English speakers.  It is estimated that drivers would have had to scroll over 300 electronic screens of fine legal minutiae to even get to the arbitration provisions embedded at the end of such contracts.  The December 2015 Services Agreement and Addendum by itself is 16,000 words long and would require an estimated over 160 electronic screens to read.

- Any notice to drivers regarding waivers of right to arbitration must be done in plain English. During the past two decades, the Securities Exchange Commission has been committed to what is called the "Plain Writing Initiative," an endeavor to make it easy for the public to understand government and disclosure documents, and the Plain Writing Act was made law in 2010. *See Plain Writing Initiative,* the Securities Exchange Commission, *available at* https://www.sec.gov/plainwriting.shtml. Likewise, Uber's Services Agreements, including the Arbitration Provisions, should also be in plain English in order to "reasonably communicate" to Uber drivers, who are blue-collar workers who typically have not achieved

the highest level of education, the terms and conditions in the agreement. *See Ball v. SFX Broad.*, 236 A.D.2d 158, 159, 665 N.Y.S.2d 444, 445 (App. Div. 1997) (finding procedural fairness where the arbitration agreement consisted of four lines written in plain English).

**B. The December 2015 Services Agreement Is Substantively Unconscionable.**

- The December 2015 Services Agreement is a one-sided agreement that allows Defendants to revise any provision of such agreement at will, and the drivers must consent to any such amendment. *See* § 14.1 ("Customer hereby acknowledges and agrees that … Customer is bound by any future amendments and additions"). *See Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002) (finding the "We Can Work It Out" agreement which required the employee to arbitrate, but left the employer free to revoke or alter the arbitration plan unenforceable).

- Although the December 2015 Services Agreement states that "arbitration is not a mandatory condition of [driver's] contractual relationship with Uber," drivers aren't able to work unless they accept the agreement through the Uber driver platform. *See* § 15.3 (viii).

- Although the December 2015 Services Agreement states "arbitration does not limit or affect the legal claims you may bring against Uber," *See* § 15.3, first subheading, such statement is patently false and misleading. Because of the high cost of arbitration, which is never disclosed nor the fees charged by JAMS, the ability for drivers to bring claims against Uber is definitely severely affected based on the arbitration provision.

- Uber retains the benefit of litigating IP issues that are beneficial to it, but drivers are precluded from litigating all claims, other than asserting claims in administrative forums that legally cannot be waived. *See* § 15.3 (ii). Courts have found one-sided arbitration clauses substantively unconscionable where claims most likely to be brought by one party are exempted from the arbitration provision. *See Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126 (7th Cir. 1997) (finding employer required employee to arbitrate, but employer did not agree to submit its claims to arbitration); *Salazar v. Citadel Comm'ns Corp.*, 90 P.3d 466 (N.M. 2004) (holding arbitration agreement was illusory where employee was obligated to arbitrate but employer was not); *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616 (3d Cir. 2009) (finding one-way arbitration clauses unconscionable *per se*). Defendant's arbitration provision lacks mutuality because it requires Plaintiffs to arbitrate all of their statutory claims (other than administrative claims that by law were unwaivable), but conveniently carves out an exception that permits Defendant to adjudicate intellectual property rights in court. *See Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 725 (2004) ("it is far more often the case that employers, not employees, will file [intellectual property] claims."). This lack of mutuality in the arbitration provision should factor into determining whether the agreement is unconscionable. *See Dan Ryan Builders, Inc. v. Nelson*, 508 F. App'x 207, 208 (4th Cir. 2013) (recognizing that a court may decline to enforce a contract clause such as an arbitration provision if the obligations or rights created by the clause unfairly lack mutuality; *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 894 (9th Cir. 2002) (finding that the asymmetrical clause requiring employees and not the employer to arbitrate was unconscionable); *Triarch Indus. v. Crabtree*, 158 S.W.3d 772, 775 (Mo. banc 2005) (finding a "non-mutual" arbitration provision is unconscionable);

- The arbitration provisions are contracts of adhesion because they are standardized clauses drafted by Defendant (who have superior bargaining strength relative to Uber drivers or those

3

seeking to become Uber drivers) and the agreements are presented on a take-it-or-leave-it basis. *See Ajamian v. Cantor CO2e, L.P.,* 203 Cal. App. 4th 771, 796 (2012) ("The finding that the arbitration provision was part of a nonnegotiated employment agreement establishes, by itself, some degree of procedural unconscionability."); *Merkin v. Vonage Am. Inc.,* No. 2:13-CV-08026-CAS, 2014 WL 457942, at *6 (C.D. Cal. Feb. 3, 2014) ("Such 'take-it-or-leave-it' contracts of adhesion are frequently found to be oppressive under California law."); *Lou v. Ma Labs., Inc.,* No. 12-cv-05409 WHA, 2013 WL 2156316, at *2 (N. D. Cal. May 17, 2013); *Chavarria v. Ralphs Grocery Co.,* 733 F.3d 916 (9th Cir. 2013); *Zaborowski v. MHN Gov't Servs., Inc.,* 936 F. Supp. 2d 1145, 1151 (N.D. Cal. 2013) (citing *Lau v. Mercedes-Benz USA, LLC,* 11-CV-1940 MEJ, 2012 WL 370557, at *8 (N.D. Cal. Jan. 31, 2012)).

- The December 2015 Services Agreement contains unconscionable confidentiality provisions that only benefit Uber. See § 6.1-6.3. Although facially neutral, confidentiality provisions usually favor companies over individuals. Defendant's confidentiality provision is overbroad and substantively unconscionable because it provides Uber with unfair advantages. *See Ting v. At&T,* 319 F.3d 1126, 1151-52(9th Cir. 2003) (finding confidentiality agreements create a "repeat player" advantage for companies because they will know the results of the arbitration despite the confidentiality agreement, whereas individual plaintiffs would not have access to the information); *Kanbar v. O'Melveny & Myers,* 849 F. Supp. 2d 902 (N.D. Cal. 2011) (holding several provisions of a law firm's arbitration agreement for employment disputes were unenforceable because they gave unfair advantages to the employer). The confidentiality provision in *Kanbar* limited with whom an employee could communicate regarding the arbitration. The court found this provision to be unconscionable because it stifled an employee's ability to investigate and gather evidence and, therefore, placed the employer in a superior position; *see also, Cole v. Burns Int'l Security Servs.,* 105 F.3d 1465, 1476 (9th Cir. 2014) (opining that because companies continually arbitrate the same claims, the arbitration process tends to favor the company).

## C. The December 2015 Services Agreement Is Misleading, Vague and Legally Invalid

- Uber gets to pick the arbitrator even though the provision states that both sides will mutually agree on an arbitrator. However, if the parties can't agree, and there is no reason why Uber would agree to any arbitrator that a driver may choose, the default arbitrator is JAMS, which is designated by Uber under the December 2015 Services Agreement. See § 15.3 (iii).

- Although Uber states that the arbitration costs will be split, they never actually provide notice of what actual costs of arbitration could be. *See* § 15.3 (vi). Moreover, since Uber can single handedly change the terms of the December 2015 Services Agreement, Uber could choose to compel drivers to bear the entire cost of any arbitration at any time.

- The December 2015 Services Agreement does not include an opt-out form. Instead, drivers are required to obtain counsel in order to prepare a legal notice to Uber to opt-out of the arbitration provision within 30 days of the agreement being "executed by [driver]." See Section 15.3 (viii). Thirty days to opt out is insufficient as frequently, federal judges routinely allow at least 60 days to allow parties to seek and retain counsel. *See Weinberger v. Prestigiaco,* Docket No. 14-cv-6136 (S.D.N.Y.); *Preda v. New York Presbyterian Hosppital,* Docket No. 08-cv-10724 (S.D.N.Y.); *Silva v. Cofresi,* Docket No. 13-cv-3200 (S.D.N.Y.) (each court allowing 60 days for parties to obtain new counsel). Particularly given the length and complexity of the December 2015 Services Agreement at issue, 30 days is an insufficient amount of time to reconsider. Even in Age Discrimination in Employment Act ("ADEA")

cases, parties already represented by counsel are allowed up to at least 45 days to reconsider the terms of a settlement agreement.

- Uber fails to provide the arbitration rules in the December 2015 Services Agreement. Although Uber does provide a link to www.jamsadr.com/rules-streamlined-arbitration, *See* §15.3 (iii), the rules provided in the JAMS website are only in English or Spanish and are 25 pages long, and could not even be "re-printed or used in any way" by drivers unless they already a party to an arbitration using such rules.  *See* Exhibit I to C.K. Lee Affidavit.  As such, drivers are precluded from considering such JAMS rules prior to agreeing to arbitration because it violates copyright laws asserted by JAMS.  Moreover, none of the JAMS rules, including the subsection 26 titled "Fees," actually describe the fees charged by JAMS that drivers would be required to share equally with Uber.

- Where the face of the agreement is vague, it must be invalidated or at least construed most favorably to the non-drafting party (i.e. Plaintiffs and drivers) ("New York follows the well-established contra proferentem principle which requires that an equivocal contract…be construed against the drafter." *First Am. Int'l Bank v. Cmty's Bank,* No. 10 Civ. 3775 (PAE), 2012 U.S. Dist. LEXIS 136474, 2012 WL 4341740, at *7 (S.D.N.Y. Sept. 21, 2012) (quoting *McCarthy v. Am. Int'l Grp., Inc.,* 283 F.3d 121, 124 (2d Cir. 2002)). A contract that is internally inconsistent in material respects or that reasonably lends itself to two conflicting interpretations is subject to the rule invoking strict construction of the contract in a light most favorable to the non-drafting party. *Natt v. White Sands Condominium,* 95 A.D.3d 848, 943 N.Y.S.2d 231 N.Y.A.D. 2 Dept., (2012). The purpose of this rule is "to protect the party who did not choose the language from an unintended or unfair result." *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63, 115 S. Ct. 1212, 1219 (1995).

- Compliance with prevailing standards of obtaining non-coercive consent is easily achieved. However, Defendant has chosen to maintain their coercive tactics to ensure as many drivers as possible sign away their rights. Defendant may argue that it used best efforts and that Plaintiffs are arguing for an impossible standard for procedural fairness. However, Defendant can easily (i) require all Uber drivers to pick up at Uber's offices a hard copy of the Services Agreement, made available in English and their native languages, and sign to indicate that they are in receipt of a copy of the Services Agreement in their native language. *Cf.* New York Labor Law § 195 (wage notices in employee's primary language required with employee acknowledgment); or (ii) provide a one-page notice of arbitration written in plain English instead of impossible-to-understand legalese such as provided below:

  "If you sign this document, it will be difficult for you to sue Uber. If Uber fails to properly compensate you for your work, for example, you will have to spend money to hire an attorney to represent you in arbitration, and you are required to pay half of the arbitration fees. This may cost you tens of thousands of dollars, which may exceed the potential recovery of any claims you may have. You may avoid such consequences and protect your right to join any class actions, however, by opting out of this arbitration provision by signing the attached Opt Out Form."

Even in a legal system where a presumption for arbitration has become widely-accepted, "the presumption in favor of arbitration is not a mindless mantra." *Rogers v. Comcast Corp.*, 341 F. Supp. 2d 42, 46 (D. Mass. 2004) (citing *Hendrick v. Brown & Root. Inc.*, 50 F. Supp.2d 527, 538 (E.D.Va. 1999)).

Uber has had more than three years to draft and implement a legally valid arbitration agreement for its drivers, using teams of high priced attorneys billing hundreds, if not thousands of hours to drafting and redrafting the arbitration provision.  However, despite multiple decisions detailing the invalidity of their illegal tactics, Uber still insists on its one-sided unconscionable terms, implanted under coercive tactics where drivers are not allowed to access the Uber software platform to start working and picking up passengers unless they select the "I agree" button (whether they understand its import or not).

II.    **Facts Supporting That Plaintiffs Are Non-English Speakers**

Plaintiffs Kai Peng, Saizhang Guan and Longbin Li started working as Uber drivers using the Uber driver app at various times in 2015. *See* Peng Decl. ¶ 1, Guan Decl. ¶ 1, and Li Decl. ¶ 1. Each of the Plaintiffs is a native Chinese speaker and does not speak or has very poor command of English. Peng Decl. ¶ 2, Guan Decl. ¶ 2, and Li Decl. ¶ 2.

When signing up to work as an Uber driver, each of the Plaintiffs downloaded a Chinese version of the Uber driver app with a user interface entirely in Chinese. Peng Decl. ¶¶ 3-4, Guan Decl. ¶¶ 3-4, and Li Decl. ¶¶ 3-4. Had it not been in Chinese, each of the Plaintiffs would have been unable to use the Uber driver app. *Id.* The registration process, which was performed on the Uber driver app, was entirely in Chinese with the sole exception of the April 2015 Services Agreements, which was in English. Peng Decl. ¶ 4, Guan Decl. ¶ 4, and Li Decl. ¶ 4. When Plaintiffs were prompted to agree to the April 2015 Services Agreement and Addendum, Plaintiffs were required to click the "YES, I AGREE" button because it was the only way for them to pass the registration process and start working.

In or about December 2015, each of the Plaintiffs was prompted to accept a purported December 2015 Services Agreement and Addendum, which was again, in English and incomprehensible to Plaintiffs. Peng Decl. ¶ 6, Guan Decl. ¶ 6, and Li Decl. ¶ 6. Plaintiffs were prompted to accept such documents when they were getting ready to work and felt coerced to click the "YES, I AGREE" button because it was the only way for them to start working. Peng Decl. ¶ 6, Guan Decl. ¶ 6, and Li Decl. ¶ 6. None of the Plaintiffs was aware of any of the terms and conditions in any of the Services Agreements and Addendums, including the Arbitration Provisions, because the Services Agreements were in English

and Plaintiffs could not read them. Peng Decl. ¶¶ 9-10, Guan Decl. ¶¶ 9-10, and Li Decl. ¶¶ 9-10. All other correspondences with Uber by Plaintiffs were in Chinese, including monthly statements, etc.

Plaintiffs do not have the means to have any of the Services Agreements and Addendums translated from English into Chinese. Peng Decl. ¶ 8, Guan Decl. ¶ 8, and Li Decl. ¶ 8. Translating even one of these documents would cost thousands of dollars, let alone multiple versions of them. *Id.*

## III.   Defendant Failed to Establish Assent to the December 2015 Services Agreement

### A.   Defendant Has the Burden of Establishing Assent

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir. 2004). And one such principle is that "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002). These principles apply equally to the emergent world of online product delivery, pop-up screens, hyperlinked pages, clickwrap licensing, scrollable documents, etc. *See id.* at 31. "In the absence of contrary proof, it can be assumed that **the burden should be on the offeror to impress upon the offeree**—i.e., the average internet user—the importance of the details of the binding contract being entered into." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 382 (E.D.N.Y. 2015) (emphasis added).

This Court has discussed at length in *Berkson* the reasoning for imposing the burden of establishing assent to an online electronic contract on the offeror/vendor. First, "there is a difference between paper and electronic contracting. Based on assumptions about internet consumers, they require clearer notice than do traditional retail buyers." 97 F. Supp. 3d at 382. *See also,* Juliet M. Moringiello, *Signals, Assent and Internet Contracting*, 57 Rutgers L. Rev. 1307, 1316 (While "a written signature provides the traditional evidence of assent because when we are asked to sign something, we are conditioned to think that we are doing something important… Actions taken by Internet users might not be as clear").

Second, the burden of showing agreement to details of an electronic contract of adhesion on a website – or on a smartphone app interface – "is on the vendors [because] [i]t is the vendor who designs

the website and puts into it terms favoring itself." *Berkson*, 97 F. Supp. 3d at 403. Third, "[t]he offeror has thought through the problems with the aid of lawyers and other experts and is a 'repeat player.'" *Id.* at 382-83 (citing Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change*, 9 L. & Soc'y Rev. 95, 97-104 (1974)). Additionally, "[t]he burden should include the duty to explain the relevance of the critical terms governing the offeree's substantive rights contained in the contract." *Id.* at 382; *see also Specht*, 306 F.3d at 31-32, 35 (finding a reference to the existence of terms on a submerged screen insufficient to place consumers on inquiry or constructive notice of those terms); *see also* Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* at 211 (2013) (criticizing what courts have construed to constitute manifestation of assent as having "wandered too far from the truth").

### B. Defendant Failed to Establish Assent Under the Reasonable Communicative Test

The Second Circuit has routinely applied the "reasonable communicative test" in assessing whether an electronic contracts of adhesion has been formed. *See Specht*, 306 F.3d at 30-32, 35 (applying reasonable communicativeness test to internet browsewrap contract); *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 383 (2d Cir. 2007) ("Determining whether to dismiss a claim based on [an arbitration clause] … [t]he first inquiry is whether the clause was **reasonably communicated** to the party resisting enforcement.") (emphasis added).

#### a. The Design and Content of the Uber Driver App Does Not Encourage Drivers to Examine the Terms

"Where the purported assent is largely passive," such as in the case of online electronic contracts, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012). "[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that *a reasonable person would understand to constitute assent*." *Schnabel*, 697 F.3d at 120. "Inquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." *Specht*, 306 F.3d at 30 n.14. In making a determination about whether a prudent offeree was on inquiry notice of the terms of a contract, the "[c]larity and

8

conspicuousness of [the] terms are important… ." *Specht*, 306 F.3d at 30. An electronic contract "will be enforced when a user is **encouraged** by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage." *Berkson*, 97 F. Supp. 3d at 401.

Defendant failed to meet its burden of establishing assent to the December 2015 Services Agreement. Defendant provided the following vague narrative to the Court in its moving papers:

> "On December 11, 2015, Plaintiffs were presented with and accepted a revised agreement through the App, the December 11, 2015 Technology Services Agreement … Plaintiffs were also presented with a revised driver addendum on December 11, 2015."

Colman Decl. ¶¶ 14, 16. Defendant conveniently failed to mention that the only notice of the December 2015 Agreement Uber drivers received was a pop-up notification as Uber drivers log on to the Uber driver app, which typically took place when they were getting ready to drive, or waiting to pick up the next passenger, and were compelled to click "Yes, I agree" in order to start or continue working.  If they were in the middle of a job, they could not even close out the job unless they clicked the "Yes, I agree" button.

Defendant also conveniently failed to mention that, on the screen which prompted users to agree to the Services Agreement (see Df. Mot. Ex. A), Plaintiffs and other users of the Uber driver app were **not** required to view or even open the link to the December 2015 Services Agreement in order to click the "YES, I AGREE" button. As such, Defendant's Services Agreements are similar to a browsewrap agreement in that the terms are only visible via a hyperlink, but also somewhat like a clickwrap agreement in that the user must do something else—click "YES, I AGREE"—to assent to the hyperlinked terms.[1]

"There is a crucial distinction between online agreements that a user **must** view because of the nature of the website's construction and design … and those that merely require a user to click an 'I agree' box that appears next to a hyperlink containing 'terms of use'... ." *Berkson,* 97 F. Supp. 3d at 398; *see also Specht*, 306 F.3d at 22-23 (finding a "signal difference" between the software for which the

---

[1] Courts have criticized the validity of hyperlinks as legally binding agreements. *Berkson*, 97 F. Supp. 3d at 400 ("Judges and law clerks tend to be sophisticated about navigating the internet and website. Are they attributing their superior knowledge to that of "read-less and run" types? A "hyperlink," which is activated by clicking on an underlined word or term, with its serious legal ramifications, may not be fully understood by many consumers.").

defendant supplied only hyperlinked terms and other software for which users "were automatically shown a scrollable text of that program's license agreement and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they accepted all the license terms.").

Courts of Appeals, including the Second Circuit, while accepting the general definition of what constitutes a clickwrap agreement, have not yet ruled on the per se enforceability of these agreements. *See id.* at 397. A number of lower courts and state courts have invalidated agreements where the online contract of adhesion was not reasonably communicated to the users. *See, e.g., Berkson,* 97 F. Supp. 3d 359 (finding no contract even though the hyperlink to the "terms of use" was right above the sign-in button indicating acceptance); *Resorb Networks, Inc. v. YouNow.com*, 2016 NY Slip Op 26112, ¶ 5 (Sup. Ct.) (finding no constructive notice of "clickwrap" agreement to arbitrate).

In *Berkson*, the court refused to find assent where, "above the 'SIGN IN' button, the website indicates: 'By clicking 'Sign in' I agree to the <u>terms of use</u> and <u>privacy policy</u>." ... [where] [t]he "terms of use" and "privacy policy," ... appear to be hyperlinked" and "[c]licking on the "SIGN IN" button does not display either the "terms of use" or Gogo's "privacy policy." 97 F. Supp. 3d at 374 (emphasis in original).

Here, like in *Berkson,* clicking on the "YES, I AGREE" button does not display any of the documents listed above such button. *See* Colman Decl. ¶ 8. On the same screen where Plaintiffs were prompted to click on the "YES, I AGREE" button (Df. Mot. Ex. A), except for the small ">" sign accompanying the titles of each of the documents, nowhere on the screen does it indicate how these documents can be accessed or viewed. (*Id.*) Defendant merely states,

> "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW."
> "By clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above."

Such "design and content of the [smartphone app] and the agreement's webpage" does **not** "**encourage**[] ... [Plaintiffs] to examine the terms [by making it] **clearly** available through hyperlinkage." *Berkson*, 97 F. Supp. 3d at 401.

With respect to the December 2015 Services Agreement, the Court should also consider that Plaintiffs and other Uber drivers were prompted to view and agree to such documents by a pop-up notification, typically while they were in the middle of a job (and needed to accept in order to complete their job) or getting ready to drive. An analogous scenario would be if the undersigned were to receive a notice to pay a credit card bill on the day this opposition was due, and the undersigned's computer was frozen, precluding any writing or research for this memorandum, until he consented to pay an outstanding credit card bill. Moreover, the December 2015 Services Agreement, alone, was over 16,000 words long, was never provided to Plaintiffs in paper form, and could have been viewed only from a smartphone screen, which normally shows approximately 100 words per screen. As such, any Uber driver would have to scroll through more than 160 screens of fine print and legalese in order to finally come across the arbitration clause embedded in the December 2015 Services Agreement.  The terms and conditions were not "reasonably communicated" to the Plaintiffs, and no contract was formed.

### C.  Defendant Failed to Establish Assent with Respect to the Named Plaintiffs

Worse still, specifically with respect to the named Plaintiffs, the design and content of the Uber driver app fail to allow Plaintiffs to examine the terms of the December 2015 Services Agreement. The December 2015 Services Agreement (as well as the April 2015 Services Agreement), including the Arbitration Provision, was provided only in English. The named Plaintiffs are native Chinese speakers and do not speak English or have very limited command of English. Peng Decl. ¶ 2, Guan Decl. ¶ 2, and Li Decl. ¶ 2. Each used a version of the Uber driver app whose entire user interface has been translated into Chinese – with the sole exception of the Services Agreement.

Specifically, when each of Plaintiffs registered on the Uber app by filling out information such as his name, address, driver license number, the user interface Plaintiffs interacted with was entirely in Chinese. *See* Peng Decl. ¶ 4, Guan Decl. ¶ 4, and Li Decl. ¶ 4. (*See also* Exhibit J to C.K. Lee Affidavit, Sample Uber Interface in Chinese.) In fact, in addition to Chinese, Uber has translated its driver app into

over 40 different languages.[2] However, none of the Services Agreements have ever been translated into a language other than English and Plaintiffs did not receive any Chinese language translation. *See* Peng Decl. ¶¶ 4-7, Guan Decl. ¶¶ 4-7, and Li Decl. ¶¶ 4-7. The screenshots provided by Defendant in Exhibit A and B to Defendant's moving papers are not true demonstrations of what Plaintiffs saw when they signed up to use the Uber driver app, nor when they purportedly assented to the December 2015 Services Agreement. What they saw on the Uber driver app was entirely in Chinese with the sole exception of the Services Agreements.

It is plain that Uber knew or at least had reason to know that Plaintiffs, as well as other non-English speakers, who make up a large percentage of Uber drivers, would not be able to read the Services Agreements in English. In fact, it was a strategic business decision by Uber to make its driver app available in different languages so as to attract non-English speaking drivers, as the success of Uber's business model requires a large network of drivers so that customer wait time for livery services is diminished. Uber cannot pick and choose and only translate what is to its advantage. By not translating the Services Agreements and Addendums, Uber clearly did not even intend for non-English speaking drivers to examine such documents, particularly when such agreements are delivered under coersive circumstances. *See Berkson*, 97 F. Supp. 3d at 401.  Given that the regular course of interaction between drivers and Uber through the driver app was in the driver's native language, any out of the ordinary English correspondence cannot be deemed a valid contractual assent.

### a.  The Exception to the Duty to Read Rule under New York Contract Law Applies

Admittedly, under New York law where the objective theory of contract is adopted, "[a]n inability to understand the English language, *without more*, is insufficient to avoid [a party from the terms of a contract]," *Maines Paper & Food Service Inc.*, 256 A.D.2d at 681 (emphasis added). However, the facts in this case are dissimilar to cases where the offeree merely failed to read the terms of the contract. As the Second Circuit noted, "While 'it is true that a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing, an exception to this general rule exists when the

---

[2] *See* www.uber.com.

writing does not appear to be a contract and **the terms are not called to the attention of the recipient.** In such a case no contract is formed with respect to the undisclosed term[s].'" *See Hirsch v. Citibank, N.A.*, 542 F. App'x 35, 37 (2d Cir. 2013) (quoting *Specht*, 306 F.3d at 30) (applying New York law and finding that there was a triable issue as to whether signature cards sufficiently referenced a document containing an arbitration provision).

Here, while Plaintiffs' "inability to understand the English language," alone, is insufficient to avoid the terms under the Services Agreements, including the Arbitration Provisions, the additional fact that the entire Uber driver app user interface was translated with the sole exception of the Services Agreements – thereby evincing Uber's intent not to have such agreements read – causes this case to fall under the exception where "the terms are not called to the attention of the recipient … [and] no contract is formed with respect to the undisclosed terms."

### b. The Services Agreements Are Form Contracts

Another reason for a finding of a lack of assent by the named Plaintiffs is that the Services Agreements are form contracts. Scholars have argued that a signature on a standard form contract is not a reasonable manifestation of assent; thus, such a contract does not satisfy the objective theory.[3] Professor Michael Meyerson reasons that because the offeror who presents the form contract for signature often knows that the offeree did not read the contract before signing it, the offeror may not reasonably regard the offeree's signature as true assent to the terms in the contract.[4] Meyerson's argument follows the basic precept of the objective theory that if the offeror receives a manifestation of assent but is subjectively aware of something that affects the offeree's ability to truly assent to the contract, the offeror cannot reasonably regard the offeree's objective manifestation, in any form, as assent.[5] In the language barrier context, finding a lack of assent on behalf of a non-English speaking party is easy using an application of

---

[3] Michael I. Meyerson, *The Reunification of Contract Law: The Objective Theory of Consumer Form Contracts*, 47 U. MIAMI L. REV. 1263, 1265 (1993). *See generally* John D. Calamari, *Duty to Read—A Changing Concept*, 43 FORDHAM L. REV. 341, 351-55 (1974) (discussing the foundational cases holding that a signature is not an automatic manifestation of assent on standard form contracts).
[4] Meyerson, supra note 2, at 1271.
[5] Wayne Barnes, *The Objective Theory of Contracts*, 76 U.CIN.L.REV. 1119, 1127 (2008).

Meyerson's view of assent.[6] Here, Uber clearly had knowledge or at least had reasons to know that the Plaintiffs and other non-English speaking drivers could not read the Services Agreements (because Uber translated the user interface of the Uber driver app into Chinese and other non-English languages but did not translate the Services Agreements).

As such, Uber cannot reasonably regard Plaintiffs and other non-English speaking drivers' objective manifestation (clicking the "YES, I AGREE" button in their own language) as assent knowing that the named Plaintiffs did not speak English, nor do they have the means to translate multiple versions of the Services Agreements and Addendums – altogether over 30,000 English words, longer than the entire Charles Dickens' novel, *A Christmas Carol*.

### c. The Doctrine of Constructive or Inquiry Notice Should Not Be Based on Manifestations Which the Offeror Did Not Reasonably Understand to Constitute Assent

"Where the assent to terms of a contract is 'largely passive,' as is often the case with electronic contracts of adhesion, 'the contract-formation question will often turn on whether a reasonably prudent offeree would be on [inquiry] notice of the term[s] at issue.'" *Berkson*, 97 F. Supp. 3d at 393 (citing *Schnabel*, 697 F.3d at 120, 126-27). Where there is no actual notice of contractual terms, "an offeree is still bound by the provision[s] if he or she is on inquiry notice of the term[s] and assents to [them] *through the conduct that a reasonable person would understand to constitute assent*." *Schnabel*, 697 F.3d at 120, 126-27.

Here, as discussed above, Uber did not reasonably understand Plaintiffs' actions to actually manifest assent. By deliberately failing to translate the Services Agreements, the only part of the Uber driver app interface that was not translated, Defendant failed to provide reasonable notice of the Service Agreements, as Plaintiffs and other non-English speaking Uber drivers may reasonably believe that the non-translated part of the registration process was either not important or not intended to be part of the contracting transaction. *See Delfingen US-Texas, L.P. v. Valenzuela*, 407 S.W.3d 791 (Tex. App. Feb. 6,

---

[6] Lauren E. Miller, *Breaking the Language Barrier: the Failure of the Objective Theory to Promote Fairness in Language-Barrier Contracting*, 43 INDIANA L. REV. 175, 189 (2009).

2013) (the Court of Appeals of Texas upheld denial of motion to compel arbitration because the human resources person told plaintiff that she would be explaining "only the important parts of the paperwork" in Spanish and did not explain the arbitration agreement which was in English).

Moreover, "[i]nquiry notice is actual notice of circumstances sufficient to put a prudent man upon inquiry." *Specht*, 306 F.3d. at 30 n.14. Here, the actual notice of circumstances – that the entire registration of the contracting process as well as the entire user interface were translated into Chinese whereas the Services Agreements were not – is not "sufficient to put a prudent man upon inquiry," because Plaintiffs could have reasonably believed that they were not important as they are not translated. The fact that "notice in bolded, all-capital font on the front page of the documents [sic]" was provided in the December 2015 Services Agreement is also irrelevant with respect to the named Plaintiffs as well as other Uber drivers who are non-English speakers. It is plain that bolded font or large font do not make a text more conspicuous and recognizable when such text is in a language one does not speak.

The case at hand is analogous to cases that have decline to enforce arbitration clauses due to a lack of notice of the terms and conditions, such as *Hines v. Overstock.com,* where the Court refused to enforce an arbitration provision because the plaintiff "lacked notice of the Terms and Conditions because the website did not prompt her to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions." 668 F. Supp. 2d 362, 367 (E.D.N.Y.2009) *aff'd* 380 Fed. Appx. 22 (2d Cir. 2010); *see also Specht,* 306 F.3d at 32 ("[A] reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms."); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 792 (N.D. Ill. 2011) (declining to enforce arbitration provision where a user only encounters the Conditions of Use was only noticeable after a "multi-step process" of clicking through non-obvious links).

A number of courts have declined to enforce agreements containing arbitration clauses based on the plaintiff's inability to speak English. In *Delfingen US-Texas, L.P. v. Valenzuela*, 407 S.W.3d 791 (Tex. App. Feb. 6, 2013), the Texas Court of Appeals upheld denial of compelling arbitration when the

plaintiff-employee was unable to read English, when the defendant failed to provide a Spanish translator to translate the agreement to her in Spanish and that a human resources representative did not discuss or explain arbitration agreement. In *Roberto Basulto v. Hialeah Automotive, Etc.*, NO. SC09-2358, 2014 WL 1057334 (Fla. 2014), the Florida Supreme Court held that the arbitration clause contained in various agreements signed by the Spanish-speaking petitioners relating to their car purchase were unenforceable. In *Ramos v. Westlake Services LLC*, No. A141353 (Cali. Ct. App. Nov. 24, 2015), a unanimous California Court of Appeal declined to enforce a pre-dispute arbitration agreement contained in a used car purchase agreement, where the Spanish language version of the contract did not include such agreement.

As such, the Court should decline to find the Plaintiffs assented to the Services Agreements based on constructive or inquiry notice.

**IV.   The Arbitration Clause in the December 2015 Agreement Does Not Apply Retroactively**

This Court should not apply the December 2015 Agreement retroactively to claims which predate December 11, 2015, when the December 2015 Agreement was issued. The Federal Arbitration Act ("FAA") explicitly distinguishes preexisting claims at the time of contract formation from future claims. The FAA recognizes that agreements to prospectively arbitrate future disputes, as well as agreements to retroactively arbitrate past or present disputes, are enforceable. However, the act explicitly distinguishes between the two:

> "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy *thereafter* arising out of such contract or transaction, . . . or an agreement in writing to submit to arbitration an *existing controversy* arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2 (emphasis added). Because the "presumption favoring arbitration applies only if there are doubts created by the contract language as to the intent of the parties … [unless] the contractual language [] evince[s] an agreement to arbitrate pre-existing disputes, the presumption does not operate at all [when] there is no doubt presented by the text of the agreement." *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 535 (E.D. Va. 1999); *see also Long v. Fid. Water Sys.*, NO. C-97-20118 RMW, 2000 U.S. Dist. LEXIS 7827, at *9 (N.D. Cal. May 24, 2000) (denying motion to compel arbitration because "[d]espite

the complete absence of any language in either the 1998 or 1999 arbitration provisions suggesting retroactive application, let alone the type of *express, unequivocal language that is required*, defendants assert the 1999 unilateral arbitration clause retroactively against Mr. Continolo."); *Connett v. Justus Enterprises of Kansas, Inc.*, 1989 U.S. Dist. LEXIS 3529, Civ. A. No. 87-1739- T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc.*, 745 So. 2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Washington University v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]"); *see also Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374, 94 S. Ct. 629, 38 L. Ed. 2d 583 (1974) (explaining that a party is compelled to submit his grievance to arbitration only if he has contracted to do so).

Here, because the December 2015 Agreement does not provide with "express, unequivocal language that is required" that it applies to claims which arose before its issuance date, the December 2015 Agreement should not be applied to claims which arose before December 11, 2015.

## V.    The Arbitration Provision Under the April 2015 Agreement Is Unenforceable

Defendant concedes that the April 2015 Agreement does not govern this dispute. *See* Df. Mot. at 11. The April 2015 Agreement has been replaced and superseded by the December 2015 Agreement. *See* Df. Mot. Ex. E, April 2015 Agreement § 14.5 "Entire Agreement" (providing that "This Agreement … replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter."). Even assuming, *arguendo*, that the April 2015 Agreement did govern, the Arbitration Provision in the April 2015 Agreement would not be enforceable following Judge Edward M. Chen's ruling in *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547, 555-56 (N.D. Cal. 2015) (holding Uber's April 2015 Arbitration Provision unenforceable because it contains a "non-severable PAGA waiver, rendering the

entire arbitration agreement also unenforceable.").[7] Moreover, the April 2015 Agreement is also unenforceable for additional reasons stated in *Mohamed v. Uber Techs., Inc.,* 109 F. Supp. 3d 1185, 1189 (N.D. Cal. 2015), because the April 2015 Agreement is substantially similar to the November 2014 Agreement, which was found to be unconscionable in *Mohamed.*

## VI. The Arbitration Provision Under the December 2015 Agreement Is Unenforceable

### A.  The Gateway Issue of Arbitrability Should Be Decided by the Court

"Courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability,'" such as "whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206, 188 L. Ed. 2d 220 (2014). Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. *AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986); *Schneider v. Kingdom of Thail.*, 688 F.3d 68, 71 (2d Cir. 2012).

When the presenting issue is whether a court or an arbitrator should determine arbitrability, "[t]he law [applies a] reverse[ ] . . . presumption to favor judicial rather than arbitral resolution." *Shaw Group Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 120-21 (2d Cir. 2003) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985, 944-45 (1995)). This is a "reverse" presumption because in determining the scope of arbitration clauses, courts generally apply a presumption in favor of arbitrability. *Washington v. William Morris Endeavor Entm't, LLC*, 2011 U.S. Dist. LEXIS 81346, at *11-12 (S.D.N.Y. July 20, 2011).

#### a.  The Delegation Clause Does Not Cover Challenges to the Enforceability of the Agreement as a Whole

Here, the delegation clause in § 15.3(i) of the December 2015 Agreement states:

"Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of ***this Arbitration Provision***, including the enforceability, revocability or validity of ***the Arbitration***

---

[7] Also, under the April 2015 Agreement, California law governs. *See* Df. Mot. Ex. C, April 2015 Agreement § 15.1.

> *Provision or any portion of the Arbitration Provision*. All such matters shall be decided by an
> Arbitrator and not by a court or judge."

(emphasis added). Note that because the issues delegated to an arbitrator are limited to issues related to "the enforceability, revocability or validity of *the Arbitration Provision or any portion of the Arbitration Provision*," contract formation issues discussed herein are ***not*** delegated to an Arbitrator because such were issues regarding the validity of the December 2015 Agreement *as a whole*, not the validity of the Arbitration Provision *within* the December 2015 Agreement. The case relied on by Defendant, *Paine Webber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) is factually distinguishable. There, the relevant part of the agreement states: "Any and all controversies … concerning … dispute or the construction, performance, or breach of *this or any other agreement* … shall be determined by arbitration …" *Id.* at 1199. The distinction is a subtle yet important one, as the Supreme Court specifically distinguished challenges to the contract as a whole from challenges to the arbitration clause contained in the contract. *Rent-A-Center,* 561 U.S. at 71 ("In some cases the claimed basis of invalidity for the contract as a whole will be much easier to establish than the same basis as applied only to the severable agreement to arbitrate").

Two more reasons support Plaintiffs' construction here. First, under New York law, "[t]he court must ascertain the intent of the parties from the plain meaning of the language employed." *Tigue v. Commercial Life Ins. Co.,* 631 N.Y.S.2d 974, 975 (4th Dep't 1995). Here, the plain meaning of the delegation clause unequivocally states that the arbitrability issues delegated to an arbitrator are "the enforceability, revocability or validity of *the Arbitration Provision or any portion of the Arbitration Provision*." Issues concerning the enforceability of the December 2015 Services Agreement, as a whole, are not delegated.

Second, because in order to "protect the party who did not choose the language from an unintended or unfair result," "a court should construe ambiguous language against the interest of the party that drafted it," *Mastrobuono,* 115 S. Ct. at 1219, the delegation clause here should be construed in Plaintiffs' favor because Uber drafted and revised numerous times the delegation clause.

### b. The Delegation Clause Is Unenforceable on Grounds of Lack of Assent and Unconscionability

Even if the Court decides that the issue of enforceability of the December 2015 Services Agreement, as a whole, is also delegated to the Arbitrator, it should nevertheless decline to enforce the delegation clause because (i) Defendant failed to establish that Plaintiffs assented to the delegation clause; and (ii) the delegation clause is unconscionable.

In *Rent-A-Center W., Inc. v. Jackson,* the Supreme Court specifically cautioned that "agreements to arbitrate are severable does not mean that they are unassailable." 561 U.S. 63, 71 (2010). There, the Supreme Court specifically allowed challenges to the delegation clause be heard by the court instead of an arbitrator, even when the delegation clause broadly delegated issues of arbitrability, including arbitrability as to the contract as a whole, to an arbitrator. *Id.* at 71-72 ("unless [plaintiff] challenged the delegation provision specifically, we must … leav[e] any challenge to the validity of the Agreement as a whole for the arbitrator.").

This case falls squarely under the scenario described by Justice Scalia in *Rent-A-Center* where the defect in contract formation (lack of assent) that affects the contract as a whole equally affects the delegation clause itself. The delegation clause it is printed in small font, not bolded nor otherwise brought to the attention of the reader and "hidden in Uber's 'prolix form' " of the December 2015 Agreement. *Mohamed*, 109 F. Supp. 3d at 1211. If Plaintiffs did not have notice of and did not assent to the December 2015 Agreement as a whole, the only logical corollary is that they also did not assent to the delegation clause buried deep within the same document.

### i. The Delegation Clause in the December 2015 Arbitration Provision is Procedurally Unconscionable

The delegation clause in the December 2015 Arbitration Provision is procedurally unconscionable because all of the factors under *Morris v. Snappy Car Rental, Inc.*, 84 N.Y.2d 21, 637 N.E.2d 253, 256 (N.Y. 1994), supporting a finding of procedural unconscionability, exist:

**The setting of the transaction**: Plaintiffs were purportedly prompted to accept the December 2015 Agreement on their smartphone before they logged on to their Uber driver app. As discussed

previously, the Uber driver app has been translated into Chinese entirely with the sole exception of their Services Agreements and Addendums, which prevented Plaintiffs from receiving any notice of the terms and conditions in the Services Agreements.

**High pressure tactics**: the delegation clause was included in the December 2015 Agreement, the acceptance of which was made a condition to continue to use the Uber app. Plaintiffs felt compelled to click on the "YES, I AGREE" button in order to start or resume work.

**Inequality of bargaining power**: Uber is a multi-billion dollar corporation who can afford to hire the most expensive lawyers and establishes one-sided contracts and sets the way such contracts are delivered and reviewed by its drivers, while Plaintiffs are blue-collar workers who are classified by Uber as independent contractors and are not paid unless they work, and who cannot even start working without accepting the one-sided Services Agreements. While Defendant is correct in stating that bargaining position is not *alone* sufficient to hold arbitration agreements unenforceable without being coupled with high pressure tactics that coerce a signatory's acceptance of onerous terms (Df. Mot. at 19), it is nevertheless one factor which supports a finding of unconscionability. *Washington v. William Morris Endeavor Entm't, LLC*, 2011 U.S. Dist. LEXIS 81346, at *21 (S.D.N.Y. July 20, 2011) ("The concept of unconscionability must necessarily be applied in a flexible manner depending upon all the facts and circumstances of a particular case.").

**Experience and education of the party**: Here, Plaintiffs are blue-collar workers who work as drivers and do not even understand English. As discussed above, Uber deliberately failed to translate any of its Services Agreements, including the delegation clause. The fact that Plaintiffs did not know what arbitration was, even when translated into Chinese, underscores their lack of higher education as well as basic literacy in English.

**Option to Opt-Out**: while Plaintiffs were given 30 days to opt-out of the December 2015 Arbitration Provision, such option was illusory at best because, again, the entire agreement was in English and Plaintiffs did not have actual or constructive notice of its terms and conditions. The fact that Plaintiffs filed this action itself demonstrates that they were in fact unaware of the terms and conditions under the

December 2015 Agreement. For all the reasons stated above, this Court should find the delegation clause procedurally unconscionable under New York law.

### ii. The Delegation Clause in the December 2015 Arbitration Provision is Substantively Unconscionable

"Substantive unconscionability focuses on the effects of the contractual terms and whether they are overly harsh or one-sided." *Damato v. Time Warner Cable, Inc.,* No. 13-CV-994 (ARR)(RML), 2013 U.S. Dist. LEXIS 107117, at *22-23 (E.D.N.Y. July 30, 2013) (internal citation omitted); *Desiderio v. Nat'l Assoc. of Sec. Dealers, Inc.,* 191 F.3d 198, 207 (2d Cir. 1999) (substantive unconscionability under New York law looks at whether contract terms are "unreasonably favorable to . . . [one] party").

Here, the delegation clause in the December 2015 Arbitration Provision is substantively unconscionable because it, like the November 2014 Arbitration Clause, impermissibly subjects Uber drivers to "pay exorbitant fees just to arbitrate arbitrability – fees which drivers would not need to pay to litigate arbitrability in Court." *Mohamed,* at 40. This is an especially salient factor given that Uber drivers such as Plaintiffs are not high-income individuals and their income working as an Uber driver is merely around two or three thousand dollars per month. *See* Complaint, ¶¶ 56-57. Moreover, Plaintiffs are required to pay their own attorney's fees, even though they would do not need to pay attorney's fees upfront based on a contingency fee basis had arbitrability been allowed to be decided by the court.

Because both procedural and substantive unconscionability exist, this Court should decline to enforce the delegation clause and decide whether the "gateway issues" of arbitrability are satisfied. *See Shaw Group Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 120-21 (2d Cir. 2003) ("[t]he law [applies a] reverse[] … presumption to favor judicial rather than arbitral resolution."). Defendant's contention that this Court should follow the decision in *Sena,* 2016 WL 1376445, by Judge Douglas L. Rayes of the Disctrict of Arizona in enforcing the delegation clause is baseless. (See Df. Mot. at 15). There, the court applied Arizona law in finding the delegation clause not unconscionable. Here, as the Court should apply New York law in evaluating the delegation clause, the *Sena* decision is irrelevant.

22

**B.  The Gateway Issues Have Not Been Satisfied**

**a.  Plaintiffs Did Not Assent to the December 2015 Arbitration Provision Because Plaintiffs Did Not Have Actual or Constructive Notice**

It is plain that an arbitration clause, which is a creature of contract, does not compel arbitration of a dispute that parties did not intend to submit to arbitration. *Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 387 (2d Cir. 2007) (citing *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)). Under New York contract law, a party is not obligated to arbitrate unless he or she consented to do so. *Robert Stigwood Org., Ltd. v. Atl. Recording Corp.*, 83 A.D.2d 123, 126, 443 N.Y.S.2d 726, 726 (App. Div. 1981). When one party seeks to compel the other to arbitrate their disputes, the court first determines whether the parties entered into a valid arbitration agreement. *Harriman Grp. v. Napolitano*, 213 A.D.2d 159, 162, 623 N.Y.S.2d 224, 225 (App. Div. 1995). The party seeking arbitration has the burden of establishing an agreement to arbitrate. *Allstate Ins. Co. v. Roseboro*, 247 A.D.2d 379, 380, 667 N.Y.S.2d 914 (App. Div. 1998).

Here, the purported Arbitration Provision is buried deep in the last quarter of Uber's over-16,000-word-long Services Agreement, which was never provided to Plaintiffs in paper form and could have been viewed only from a smartphone screen. Assuming that a standard smartphone screen shows 100 words per screen, it requires a user to flip through approximately 100 screens just to reach the purported Arbitration Provision in the Services Agreement. Such provision was not "reasonably communicated" to the Plaintiffs.  As already discussed above, Plaintiffs did not assent to be bound by the terms of the Services Agreements, including the December 2015 Arbitration Provision. Similarly, Plaintiffs did not have actual or constructive notice of the opt-out provision. For the same reasons Plaintiffs could not have manifested assent to be bound by the Services Agreements, this Court should find that they have timely opted-out of the December 2015 Arbitration Provision. Plaintiffs have filed their opt-out notice on February 1, 2016, or 52 days after they purportedly clicked on the "YES, I AGREE" button which were purportedly prompted onto the screen of their smartphones to confirm their acceptance of the December 2015 Agreement. While such opt-out notice was sent to Uber past the 30-day deadline to opt-out of

Defendant's December 2015 Arbitration Provision, this Court should nevertheless deem such opt-out to be timely because the notice was entirely in English and Plaintiffs did not have actual or constructive notice of the opt-out provision.

Moreover, the 30-day opt-out period is too short considering (i) the Arbitration Provision itself is long and not written in plain English; and (ii) Plaintiffs did not speak English and would need a translator and an attorney to realistically understand the terms and conditions in the Arbitration Provision. Such is similar to a motion to withdraw as counsel scenario, where courts typically grant 60 days for the party to seek out and hire a new attorney. *See, e.g., SEC v. Alexander*, 2004 U.S. Dist. LEXIS 12001, at *9 (S.D.N.Y. June 28, 2004) (granting defendants 60 days to hire new counsel after prior counsel withdraw); *Eaton v. Prior, Belmay and Vermont State Police,* No. 2011-276, 2012 Vt. 54 (2012) (same).

### b. Plaintiffs' Claims that Uber Breached the Unilateral Contract under the New York City 2015 Guarantee Program Falls Out of the Scope of the Service Agreements

Defendant's argument that "Plaintiffs cannot have it both ways—asserting a breach of the Services Agreements while at the same time seeking to evade the Arbitration Provision within those very same agreements" (see Df. Mot. at 17) is simply wrong. The Complaint has clearly alleged that Uber breached its contract under the common law "unilateral contract" theory pursuant to the terms under the "New York City 2015 Guarantee Program" (See Complaint ¶¶ 101-105).

A unilateral contract exists when an offer for a unilateral contract is made, and when someone performed according to the terms of the offer, and the offeror is bound by the duty to perform his or her own obligation under the terms of offer for the unilateral contract. *See, e.g., I. & I. Holding Corp. v. Gainsburg*, 276 N.Y. 427, 434, 12 N.E.2d 532, 534 (1938) ("[i]f an offer for a unilateral contract is made, and part of the consideration requested in the offer is given or tendered by the offeree in response thereto, the offeror is bound by a contract, the duty of immediate performance of which is conditional on the full consideration being given or tendered within the time stated in the offer, or, if no time is stated therein, within a reasonable time."); *In re Larney's Estate*, 148 Misc. 871, 876, 266 N.Y.S. 564, 570 (N.Y. Sur.

Ct. 1933) ("[A] unilateral contract is established if: "A by promissory words gives to B the power of creating in himself a right in personam against A by doing an act or acts which A desires to be done.").

Here, Uber made the offer for a unilateral contract by promising that if Uber drivers met all the conditions listed under the "New York City 2015 Guarantee Program," they would be awarded with the "Guarantee Payout" according to the terms of the offer. (See Complaint ¶¶ 44-51). Defendant's assertion that Plaintiffs "assert[ed] a breach of the Services Agreements" is wrong. The unilateral contract created by Uber's offer under the "New York City 2015 Guarantee Program" is a separate contract and it does not depend on the validity of the Services Agreements. The issue here is whether Plaintiffs' claims for damages arising out of Uber's breach of unilateral contract are the type of claims with respect to which the Arbitration Provisions can be enforced. They are not, because, as discussed above, Plaintiffs never assented to be bound by any of the Arbitration Provisions.

## VII.   The Class Action Waiver Is Unenforceable

Defendant erroneously relied on the case *AT&T Mobility v. Concepcion*, 563 U.S. 333 (2011) and *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015) in arguing that class action waivers in arbitration agreements are enforceable. This is because *Imburgia* and *Concepcion* involve consumer contracts where the court did not need to consider the interplay between the FAA and the National Labor Relations Act ("NLRA"). It has been the long-held position of the National Labor Relations Board ("NLRB") that class action waivers prohibit employees from acting in concert to vindicate workplace rights and are therefore unenforceable.[8] The Class Action Waiver in this case effectively strip Plaintiffs and other Uber drivers of any opportunity of vindicating their rights under the law as their individual recovery "would be too meager to justify the expenses required for the individual prosecution of the plaintiff's claim and would prevent the plaintiff from obtaining legal representation." *Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547, 548 (S.D.N.Y. 2011) (finding arbitration agreement containing class action waiver in a Fair Labor Standards Act and New York state law class action unenforceable).

---

[8] *See, e.g., D.R. Horton, Inc.*, 357 NLRB No. 184 (2012); *Murphy Oil USA, Inc.*, 361 NLRB No. 72 (2014). Petitions are currently pending before the NLRB claiming that Uber drivers are "employees" within the NLRA. *See Uber USA, LLC*, NLRB Case No. 29-RC-168855 (Pet. Filed Feb. 2, 2016).

Dated:  New York, New York

May 18, 2016

Respectfully submitted,

LEE LITIGATION GROUP, PLLC

By: /s/ C.K. Lee
C. K. Lee, Esq. (4086)
Shanshan Zheng (3301)
30 East 39th Street, Second Floor
New York, NY 10016
212-465-1188 (tel)
212-465-1181 (fax)
*Attorneys for Plaintiffs and the Class*