UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
KAI PENG, SAIZHANG GUAN and
LONGBIN LI

                          Plaintiff,

                                                    **MEMORANDUM & ORDER**
              -against-                              16-CV-545 (PKC) (RER)

UBER TECHNOLOGIES, INC.,

                          Defendant.
--------------------------------------------------------X

PAMELA K. CHEN, United States District Judge:

Plaintiffs are car service drivers ("drivers") who have brought this lawsuit, as a putative

class action, alleging breach of contract by Defendant Uber Technologies, Inc. ("Defendant" or

"Uber").  Before the Court is Defendant's motion to compel arbitration.  For the reasons stated

herein, the Defendant's motion is GRANTED, and this action is stayed pending arbitration.

## BACKGROUND

### I.  FACTUAL BACKGROUND

#### A.  Plaintiffs' Agreements with Uber

Uber is a technology company that allows drivers and potential riders to connect through

a smartphone application (the "Uber App").  (Dkt. 22 ("Colman Decl."), at ¶ 3.)[1]  In New York

City, before drivers can use the Uber App to find riders, they must enter into an agreement with

Uber USA, LLC, a wholly owned subsidiary of Uber.  (*Id.* at ¶ 7).  Drivers using the Uber App

can hire other drivers to transport riders on their behalf under their Uber accounts.  (*Id.*)  But all

---

[1] Though the relationship between Uber and the drivers who sign up for the App resembles that of a company-contractor, Uber characterizes it as a service provider-customer relationship.  (*See, e.g.*, Colman Decl., Ex. E, at § 14.1.)

drivers must accept a "Driver Addendum," which incorporates by reference the operative arbitration provision. (*Id.*)

When Plaintiffs signed up to use the Uber App,[2] the operative agreement was the "Software License and Online Services Agreement dated April 3, 2015 (the "April 2015 Services Agreement") along with the Driver Addendum to Software License and Online Services Agreement dated November 10, 2014 (the "November 2014 Driver Addendum"). (Colman Decl., Exs. C & D.) New drivers had to accept these agreements to begin working. (Colman Decl., at ¶ 8.) The April 2015 Services Agreement contained a clause stating that Uber could "modify the terms and conditions of this Agreement or the Driver Addendum at any time" and that "by using the Uber Services, or downloading, installing, or using the Driver app, Customer [*i.e.*, the driver] is bound by any future amendments and additions to this Agreement." (Colman Decl., Ex. C, at § 14.1.)

On or about December 11, 2015, Uber issued an updated Services Agreement and Driver Addendum (Colman Decl., Exs. E & F, ("December 2015 Services Agreement" and "December 2015 Driver Addendum")), and once again drivers had to accept the updated Agreement and Addendum to continue working. (Colman Decl., at ¶ 9.) The two Services Agreements are substantially similar, in relevant part.[3] The first page of the December 2015 Services Agreement

---

[2] Plaintiff Peng signed up as an Uber driver in June 2015; Plaintiff Guan signed up in July 2015; and Plaintiff Li signed up in October 2015. (Dkt. 26 ("Peng Decl."), at ¶ 1; dkt. 27 ("Guan Decl."), at ¶ 1; dkt. 28 ("Li Decl."), at ¶ 1.)

[3] One main difference between the Agreements is that the December 2015 Services Agreement contains certain provisions that are not in the April 2015 Services Agreement, including one about California's Private Attorneys General Act of 2004 and another specifying that the validity of the class action waiver will be decided by the Court rather than by the arbitrator. (Colman Decl., Ex. C & E.) And as discussed in Part IV, *infra*, the December 2015 Services Agreement also contains an additional provision regarding payment of fees that is more protective of the drivers. Because the December 2015 Services Agreement is the operative agreement, the Court sets forth the relevant provisions of that agreement only.

contains a paragraph in bold, capitalized text, alerting the reader to the relevant arbitration

provision ("Arbitration Provision"), which is provided in full later in the December 2015

Services Agreement:

> **IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES AND THE ASSOCIATED SOFTWARE, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW IN SECTION 15.3 CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION. BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING SECTION 15.3) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN SECTION 15.3 BELOW.**

(Colman Decl., Ex. E.)  The Arbitration Provision itself starts on page 16 of the Services

Agreement (if viewed on a computer), and is eight pages long.  It contains the following

paragraph in bold, capitalized text:

> **WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ABRITRATION. YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

(*Id.* at § 15.3.)  In a subsection labeled "IMPORTANT," the Arbitration Provision informs

drivers that they will be required to "resolve any claim that [they] may have against Uber on an

individual basis, except as provided below, pursuant to the terms of the Agreement unless [they] choose to opt out of the Arbitration Provision," and that the provision "preclude[s] [them] from bringing any class, collective, or representative actions [except under California's Private Attorneys General Act of 2004 ("PAGA")] against Uber" or from participating in any such actions. (*Id.*)

It specifies that "[u]nless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, [the driver] [would] be required to split the cost of any arbitration with Uber." (*Id.*). In a subsection entitled "Paying for the Arbitration," this provision is further qualified:

> Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party). In all cases where required by law, Uber will pay the Arbitrator's and arbitration fees. If under applicable law Uber is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, You will not be required to bear any type of fee or expense that You would not be required to bear if You had filed the action in a court of law.[4] Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Uber shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

*Id.* at § 15.3(vi).

The Arbitration Provision further provides:

> This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates. Nothing contained in this Arbitration Provision shall be construed to prevent or excuse You from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

---

[4] This sentence does not appear in the April 2015 Services Agreement. (Colman Decl., Ex. C, at § 15.3(vi).)

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration. Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative (non-PAGA) action. . . .**

(*Id.* at § 15.3(i))

The Arbitration Provision also contains a "delegation clause," stating that the arbitrator will decide questions about the validity and scope of the arbitration clause itself, *i.e.*, questions of "arbitrability":

> Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes [that will be decided by arbitration] include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity. Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and Uber . . . .

(*Id.*)

Lastly, the Arbitration Provision also includes an "opt-out" provision, stating:

> **"Arbitration is not a mandatory condition of your contractual relationship with Uber. If You do not want to be subject to this Arbitration Provision, You may opt out of this Arbitration Provision by notifying Uber in writing of Your desire to opt out of this Arbitration Provision, which writing must be dated, signed and delivered by electronic mail to optout@uber.com, by U.S. Mail, or by any nationally recognized delivery service (*e.g*, UPS, Federal Express, etc.), or by hand delivery" [to listed address] . . . within 30 days of the date this Agreement is executed . . . .**

(*Id.*)

In order to use the Uber App to receive transportation requests, Uber drivers had to click on a "YES, I AGREE" box twice to indicate assent to Uber's Services Agreement.[5]  (Colman Decl., at ¶ 8.)  Before going online, drivers were directed to a page titled, "TERMS AND CONDITIONS", which said on the top "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW."  (Colman Decl., Ex. A.)  There was no time limit for drivers to review the contracts, which were available by hyperlink on the same page.  (Colman Decl., Ex. A; Colman Decl., at ¶ 8.)  On the bottom of the page, there was a clickable blue box with the large, capitalized words, "YES, I AGREE".  (Colman Decl., Ex. A).  Directly above the blue box, there was a provision that read, "By clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above." (*Id.*)  Clicking on the "YES, I AGREE" button would cause the background of the page to go dark, and a centrally located white box would pop up, stating in bold, capitalized text, "**PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS**."  (Colman Decl., Ex. B.)  Drivers could click either "NO" or "YES, I AGREE".  (*Id.*)  After drivers accepted the Services Agreement, a copy automatically would be transmitted to their Driver Portal, where they could review it at any time.  (Colman Decl. at ¶ 8.)

### B.  Plaintiffs' Work as Uber Drivers

Plaintiffs are all native Chinese speakers who speak little or no English.  (Dkt. 26 ("Peng Decl."), at ¶ 2; dkt. 27 ("Guan Decl."), at ¶ 2; dkt. 28 ("Li Decl."), at ¶ 2.).  Plaintiffs started working as Uber drivers in the summer and fall of 2015.  (Peng Decl., at ¶ 1; Guan Decl., at ¶ 1; Li Decl., at ¶ 1.)  When they registered to use Uber, they downloaded a Chinese version of the

---

[5] It appears that the process described in this paragraph was identical for the April 2015 and December 2015 Services Agreements.

Uber App, which had an interface that was entirely in Chinese. (Peng Decl., at ¶ 3; Guan Decl., at ¶ 3; Li Decl., at ¶ 3.) The registration process itself was in Chinese, but the April 2015 Services Agreement and Addendum were not translated into Chinese, and were only available in English. (Peng Decl., at ¶ 4; Guan Decl., at ¶ 4; Li Decl., at ¶ 4.) Each Plaintiff testified that he "vaguely recall[ed] that [he was] prompted to click on a 'Yes, I agree' button before [he] could finish the registration process," and that he "felt compelled to click on the 'Yes, I agree' button because it was the only way for [him] to pass the registration process. (Peng Decl., at ¶ 4; Guan Decl., at ¶ 4; Li Decl., at ¶ 4.)[6] Plaintiffs Li and Guan, but not Peng, testified that they were "not aware that [they] agreed to" the April 2015 Services Agreement. (Guan Decl., at ¶ 5; Li Decl., at ¶ 5.)

In December 2015, the Plaintiffs saw the "YES, I AGREE" button pop up again on their screens, and they clicked on it in order to start working and picking up passengers. (Peng Decl., at ¶ 6; Guan Decl., at ¶ 6; Li Decl., at ¶ 6.) Once again, the 2015 December Services Agreement and Addendum were in English, and none of the Plaintiffs could, or did, read it. (Peng Decl., at ¶¶ 7, 9; Guan Decl., at ¶¶ 7, 9; Li Decl., at ¶¶ 7, 9.) Plaintiffs failed to timely opt out of the Arbitration Provision.[7] According to Plaintiffs, none of them had the means to have any of the Services Agreements translated into Chinese, and none of them has the resources to pay an arbitrator to pursue their individual claims, even if the costs are split with Uber. (Peng Decl., at

---

[6] The Court infers from the Plaintiffs' statements that "the only part not translated . . . was the [Services Agreement]," that the "YES, I AGREE" button was in Chinese. (Peng Declaration, at ¶ 4; Guan Declaration, at ¶ 4; Li Declaration, at ¶ 4.)

[7] Plaintiffs sent an "opt out" letter to Defendant on February 1, 2016, more than 30 days after they agreed to the December 2015 Services Agreement, and one day before this lawsuit was filed. (Dkt. 1, Ex. A.)

¶¶ 8, 14; Guan Decl., at ¶¶ 8, 14; Li Decl., at ¶ 8, 14.) At the time the complaint was filed, Plaintiffs were still working as Uber drivers. (Dkt. 1 at ¶¶ 13, 21, 28.)

## II.    PROCEDURAL HISTORY

Plaintiffs filed the present Complaint on February 2, 2016, alleging that Defendant failed to pay them money they were owed under Uber's "New York City 2015 Guarantee" Program. (Dkt. 1, at 2.) On April 18, 2016, Defendants moved to compel arbitration. (Dkt. 20.) The motion was fully briefed on June 1, 2016.[8]

## DISCUSSION

## I.    LEGAL STANDARD

When deciding motions to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment," *Nicosia v. Amazon.com, Inc.*, 834 F. 3d 220, 229 (2d Cir. 2016) (quotations and citations omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (quotation omitted).

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement in a contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a 'liberal federal policy favoring arbitration' . . . and the 'fundamental principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S.

---

[8] In addition, on June 28, 2016, this matter was consolidated with *Guan v. Uber*, 16-cv-598, another putative class action lawsuit before this Court brought by Plaintiffs Guan and Li, alleging breach of contract for failure to reimburse Plaintiffs for tolls. Uber also filed a motion to compel arbitration in that case, which is currently pending.

333, 339 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) and *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

The Supreme Court thus has directed that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. Nevertheless, if "the dispute at issue concerns [either] contract formation" or "whether parties have agreed to submit a particular dispute to arbitration," the court must make an initial determination prior to compelling arbitration. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (alterations, internal quotation marks, and citations omitted).

## II.    PLAINTIFFS AGREED TO ARBITRATE THEIR CLAIMS WITH DEFENDANT

As a threshold matter, Plaintiffs argue that they are not bound by either of the Services Agreements on which Defendant relies in moving to compel arbitration, because the terms were not reasonably communicated to them, and they did not knowingly agree to the terms, including the arbitration clause.

### A.  The Court Decides Whether Plaintiffs Accepted the Services Agreements

The preliminary question of whether Plaintiffs assented to the Services Agreements, and therefore to the arbitration clauses, is a matter for the Court to decide notwithstanding the delegation clause discussed in III, *infra*. While the "questions of arbitrability"—(1) "whether the parties are bound by a given arbitration clause" and (2) "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" may be delegated to an arbitrator if the parties do so clearly and unmistakably, "[t]he more  basic issue . . . of whether the parties agreed to arbitrate in the first place is one only a court can answer, since in the absence of any arbitration agreement at all, 'questions of arbitrability' could hardly have been

clearly and unmistakably given over to an arbitrator." *VRG Linhas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013). *See also Dedon GmbH v. Janus et Cie*, 411 Fed. App'x 361, 363 (2d Cir. 2011) (summary order) (explaining that the Supreme Court's decision in *Granite Rock Co.* "reconfirms this circuit's well-established precedent that where a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence"); *Moore v. T-Mobile USA Inc.*, 10-CV-527, 2010 WL 5817656, at *5 (E.D.N.Y. Nov. 8, 2010) ("If the trier of fact were to find that plaintiff never agreed to the Service Agreement, the arbitration clause in the Terms & Conditions would not apply."), *report and recommendation adopted*, No. 10-CV-527, 2011 WL 609818 (E.D.N.Y. Feb. 15, 2011); *Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590 (S.D.N.Y. 2001) (explaining the "two separate analytical steps" of analysis in motions to compel arbitration: "[f]irst, I must determine whether the parties entered into a binding contract[,] [and] [o]nly if I conclude that a contract exists do I proceed to a second stage of analysis: interpretation of the arbitration clause and its applicability to the present case."), *aff'd*, 306 F.3d 17 (2d Cir. 2002).[9]

---

[9] In contrast, Plaintiffs' arguments about the *validity* of the Services Agreements as a whole must be addressed in the first instance by the arbitrator. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010) (explaining that the court "require[s] the basis of [the] challenge to be directed specifically to the agreement to arbitrate before the court will intervene," even in circumstances where an unconscionability challenge or other challenges to a contract's validity "equally [apply to] the agreement to arbitrate which was part of that contract"); *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (2004) ("Plaintiff's argument that the . . . agreement as a whole is unconscionable is for the arbitrators, rather than this Court, to decide."). And as discussed in Part III, below, Plaintiffs' arguments about the *validity* of the arbitration clause also must be addressed by the arbitrator because that gateway arbitrability issue has been delegated to the arbitrator.

### B. New York Law Applies

Issues of contract formation—regarding the two Services Agreement as a whole, and the agreement to arbitrate within those Services Agreements—are governed by the choice-of-law doctrine of the forum state, here, New York. *See Specht*, 150 F. Supp. 2d at 590 (explaining that the preliminary question of whether a contract has been formed is governed by state law, and looks to the choice-of-law doctrine of the forum state); *see also Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 387 (E.D.N.Y. 2015) ("Relying on [a contract's choice-of-law] provision before a contract has been found to have been accepted by the parties as binding is unacceptable."). "[W]hile . . . the FAA preempts state law that treats arbitration agreements differently from any other contracts, it also preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F. 3d 289, 295–96 (2d Cir. 1999); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Whether or not the parties have agreed to arbitrate is a question of state contract law.").

Under New York's choice-of-law rules, "the court evaluates the 'center of gravity' or 'grouping of contacts,' with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties.'" *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 618 N.Y.S.2d 609, 612 (1994)); *see also In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 16 N.Y.3d 536, 543 (2011) ("It is well settled that New York has long recognized the use of 'center of gravity' or 'grouping of contacts' as the appropriate analytical approach to choice of law questions in contract cases.") (internal quotation marks and citation omitted). Instead of regarding the place of making or performing the contract as conclusive, the court applies the law

of the place that "has the most significant contacts with the matter in dispute." *Auten v. Auten*, 124 N.E.2d 99, 308 N.Y. 155, 160 (1954); *see also Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999) (stating the same test).

Here, New York has the most significant contacts with the matter in dispute.[10]  Plaintiffs are drivers in New York who signed up to use the Uber App to receive transportation requests in New York.  The issues in dispute involve contract formation and employment practices in New York, which implicate significant State policy interests.  Most importantly, the payment guarantee that is at the heart of this dispute is the "New York City 2015 Guarantee Program," a program that appears only to be available to drivers *in* New York City.  Therefore, the Court finds that New York law governs the issue of whether an arbitration agreement exists between the parties.

### C.  Plaintiffs Assented to Both Services Agreements

"The making of contracts over the internet 'has not fundamentally changed the principles of contract.'"  *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)), *aff'd*, 380 Fed. App'x 22, 25 (2d Cir. 2010) (summary order).  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (internal citation and quotation marks omitted). "[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that [she has] at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance."  *Hines v. Overstock.com, Inc.*, 380 Fed. App'x 22, 25 (2d Cir. 2010) (summary

---

[10] The parties appear to agree that New York law applies to issues of contract formation in this case.

order); *see also Starke v. Gilt Groupe, Inc.*, 13-Civ.-5497, 2014 WL 1652225 (S.D.N.Y. April 24, 2014) (explaining that "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms").

A party may be bound to a "click-wrap"[11] agreement, such as the Services Agreements at issue here, by clicking a button declaring assent, so long as the party is given a "sufficient opportunity to read the . . . agreement, and assents thereto after being provided with an unambiguous method of accepting or declining the offer." *Serrano v. Cablevision Sys. Corp.*, 863 F.Supp.2d 157, 164 (E.D.N.Y. 2012). *See also Whitt v. Prosper Funding LLC*, 15-cv-136, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) (explaining that one way to establish constructive knowledge sufficient to constitute assent is to "affirmatively click a box on [a] website acknowledging awareness and agreement to the terms of [a contract] before . . . [being] allowed to proceed with further utilization of the website" (quoting *Berkson*, 97 F. Supp. 3d at 397)); *Berkson*, 97 F. Supp. 3d at 397 (stating that "almost "[e]very [lower] court to consider the issue has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable").

The record before the Court establishes that each of the Plaintiffs assented to the electronically signed Services Agreements. Plaintiffs all acknowledge that they clicked on the "YES, I AGREE" buttons when they first signed up, and again in December 2015. None of them

---

[11] The contours of what constitutes a "click-wrap," "sign-in wrap" or "browse-wrap" agreement, and the validity and enforceability of each, are still being developed by courts in the Second Circuit. *See generally Berkson*, 97 F. Supp. 3d 359 (discussing extensively the case law and details of each type of agreement). The sign-up process within the Uber App at the time Plaintiffs signed up, while it fits many definitions of a "click-wrap agreement", might not be a "pure-form" click-wrap agreement, because there is no "mechanism that forces the user to actually examine the terms before assenting." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837–38 (S.D.N.Y. 2012). Nevertheless, these distinctions do not change the Court's analysis, because under any definition, agreements like this one routinely are upheld, as discussed *infra*.

13

opted out within 30 days. Above the "YES, I AGREE" button that each Plaintiff clicked was the statement, "By clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above." The links to the documents were higher up on the same page (underneath a statement in all caps informing drivers that "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW"). After clicking "YES, I AGREE," there was a further affirmation of assent: the screen went black, and a large box popped up which read in bold, capitalized letters: "**PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS**." Plaintiffs were again directed to click either, "NO" or "YES, I AGREE."

In *Bassett v. Electronic Arts, Inc.*, 93 F. Supp. 3d 95 (E.D.N.Y. 2015), the court upheld a contract formed under very similar circumstances as those present in this case. Plaintiff clicked "I Accept" after being "presented with a screen prompting [him] to read the Terms of Service and privacy policy carefully, noting that the documents may affect [his] rights, and presenting links by which a registrant may access the full text of each agreement." *Id.* at 99. "Plaintiff [was] presented with four buttons, two of which [were] the links to the terms of service and privacy policy, one which read[] "I Do Not Accept," and one which read[] "I Have Read And Accept Both Documents." *Id.* When the Terms of Service were updated, Plaintiff was presented with a new version of the policy and had to click "I Accept" again before accessing the services. *Id.* The Court concluded that "Plaintiff manifested assent to the agreement to arbitrate when he clicked 'I Accept' during both the registration process and when later confronted with updated Terms of Service, and when he did not opt-out of the arbitration agreement using the process described in the arbitration clause." *Id.* at 104.

In fact, courts in this Circuit have upheld "Sign-In Wrap" agreements where plaintiffs did not even click an "I Accept" button, but instead clicked a "Sign Up" or "Sign In" button where nearby language informed them that clicking the buttons would constitute accepting the terms of service.[12]  Plaintiffs' assent to the Service Agreements here is far more explicit than in these "Sign-In Wrap" cases, because Plaintiffs were required to *twice* click buttons labeled, "YES, I AGREE," and were clearly and repeatedly encouraged to click on the contract containing the terms to which they were agreeing.  *See Berkson*, 97 F. Supp. 3d at 401 (explaining that "'terms of use' will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage").

Plaintiffs rely on *Berkson* in arguing that clicking the "YES, I AGREE" button was insufficient to establish assent, just as clicking the "SIGN IN" button was held insufficient in *Berkson*.  Yet *Berkson* is distinguishable in a number of ways.  The court in *Berkson* explained that the defendant in that case "did not make an effort to draw [the plaintiff's] attention to its 'terms of use,'" noting that the reader was not addressed in all caps, and there were no signifiers of importance such as the use of the word "important" or the phrase "please read."  *Id.* at 403–04. The Court further noted that "[t]he hyperlink to the 'terms of use' was not in large font, all caps,

---

[12] In *Fteja*, the court upheld a "sign-in wrap" agreement where, immediately below the "Sign Up" button, it said, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service."  *Fteja*, 841 F. Supp. 2d at 834–35.  The phrase "Terms of Service" was underlined, and clicking on the hyperlink led the user to the Terms of Service.  *Id.* at 835.  The Court, analogizing the hyperlinked terms to the terms on the back of the cruise ticket in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991) and *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7 (2d Cir. 1995), held that the plaintiff had manifested assent to the Terms of Use.  *Id.* at 839–41. *See also Starke*, 2014 WL 1652225, at *3 (upholding an agreement structured similar to the one in *Fteja*, because when plaintiff clicked the "Shop Now" button, he was informed that by doing so, he "agree[d] to the Terms of Membership," and noting that the plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them").

or in bold," and "[t]he importance of the 'terms of use' was obscured by the physical manifestation of assent . . . clicking the "SIGN IN" button." *Id.* at 404. By contrast, here, Uber drew the drivers' attention to the terms of the Service Agreement with bold, capitalized statements, and twice required the drivers to click "YES, I AGREE," a much more explicit form of assent than the single clicking of a "SIGN IN" button.

Furthermore, there was no time limit for Plaintiffs to review the contracts, which were clearly labeled and available by hyperlink on the "Terms and Conditions" page. That Plaintiffs clicked on the button because they were eager to begin driving and earning fares does not mean that they were coerced or "compelled to click 'Yes, I agree' in order to start or continue working." (Dkt. 24 ("Plaintiffs' Brief"), at 9.)

While the Court is sympathetic to Plaintiffs' argument that their assent was not informed because they were unable to read the Services Agreement, which was provided solely in English,[13] the Court is bound by clearly established law holding that failure to read a contract is not a defense to contract formation. *See Starke*, 2014 WL 1652225, at *3 ("Regardless of whether he actually read the contract's terms, [the plaintiff] was directed exactly where to click

---

[13] Plaintiffs argue, with some force, that Uber clearly was aware of the limited English language abilities of many of its drivers, given the company's translation of the Uber App into different languages (including Chinese), and yet made the conscious decision not to translate the Services Agreement into any other language. While this decision, coupled with the likelihood that few, if any, non-English-speaking Uber drivers would have the resources to have the Services Agreement translated, raises legitimate concerns about the disparity in bargaining power between Uber and its drivers, the law against excusing a party's failure to "read" the contract before agreeing to it is unequivocal. Plaintiffs certainly have not provided any case law, and the Court has found none, supporting their argument that translation of the service itself, *i.e.*, the Uber App, but not the accompanying contract, *i.e.*, the Services Agreement, defeats a finding of assent. Furthermore, any argument that the contract as a whole is invalid or unconscionable because of Defendant's decision to translate the Uber App but not the Services Agreements is for the arbitrator to decide. *See supra* note 8. Lastly, on the other side of the policy debate, it could be argued that Uber's translation of the Uber App into multiple languages enables non-English-speaking individuals to work and earn money as Uber drivers, and that the company should not be penalized for taking this step to broaden employment opportunities for these individuals.

in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them."); *Fteja*, 841 F. Supp. 2d at 839–40 (finding that, when a consumer is prompted to examine terms of sale located on another page available via hyperlink, "[w]hether or not the consumer bothers to look is irrelevant" because "[f]ailure to read a contract before agreement to its terms does not relieve a party of its obligations under the contract" (quoting *Centrigual Force, Inc. v. Softnet Commc'n Inc.*, 08-Civ.-5463, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011))); *Serrano*, 863 F. Supp. 2d at 164–65 (rejecting plaintiff's argument that "she did not know that she was signing a contract and was not provided with the Terms of Service" as unavailing); *Ballas v. Virgin Media, Inc.*, 2007 WL 4532509, at *3 (N.Y. Sup. Ct. Dec. 6, 2007) ("A party is under an obligation to read a document before accepting its terms and cannot avoid the effect of the document by asserting [that] he or she did not read or understand [its] contents . . . ."), *aff'd* 875 N.Y.S. 2d 523 (N.Y. App. Div. 2009).

Furthermore, even when the failure to read the contract is attributable to the party's inability to read or understand the language in which the contract is written, the party is still bound by his or her assent. *Victorio v. Sammy's Fishbox Realty Co.*, 14-Civ.-8678, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) (finding that "[a]n inability to understand the English language, without more, is insufficient to avoid" contractual obligations); *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 122 (2d Cir. 2010) ("New York courts have repeatedly ruled that even the fact that a prospective employee possesses an imperfect grasp of the English language will not relieve the employee of making a reasonable effort to have the document explained to him."); *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1197 (N.D. Ca. 2015) (rejecting plaintiff's argument that he could not legally assent to the contract because he did not sufficiently understand English, and explaining that a "party who agrees to terms in writing

without understanding or investigating those terms does so at his own peril") (quotation omitted), *rev'd in part on other grounds*, 2016 WL 7470557 (9th Cir. Sept. 7, 2016); *Molina v. Coca-Cola Enters., Inc.*, 08-CV-6370, 2009 WL 1606433, at *8 (W.D.N.Y. June 8, 2009) (explaining that "even if plaintiff could not read or understand English, his signature on the June 10, 2004 arbitration agreement would still be binding against him" (citing several New York cases)).

Plaintiffs argue that the Court should make an exception to the duty-to-read rule because such an exception has been upheld "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient." (Plaintiffs' Brief, at 12–13 (quoting *Hirsch v. Citibank, N.A.*, 542 Fed. App'x 35, 37 (2d Cir. 2013))). This argument fails on its face, because neither of these two caveats apply here. As discussed, the "TERMS AND CONDITIONS" screen states that "TO GO ONLINE, YOU MUST REVIEW ALL THE DOCUMENTS BELOW AND AGREE TO THE CONTRACTS BELOW." The writing is specifically designated as a contract, and the terms were brought to the drivers' attention with capital letters, bold typeface, and the use of signaling words, such as "Important."

### D. The December 2015 Services Agreement Is the Operative Agreement for the Present Dispute

Although Plaintiffs contend that the December 2015 Agreement should only apply to claims that postdate its issuance, the Court finds that the December 2015 Services Agreement is the operative agreement for all of Plaintiffs' claims in this lawsuit. The April 2015 Services Agreement expressly provided that Uber could "modify the terms and conditions of [the] Agreement or the Driver Addendum at any time" and that "by using the Uber Services, or downloading, installing, or using the Driver app, Customer [*i.e.*, the driver] is bound by any future amendments and additions to this Agreement." (April 2015 Services Agreement, § 14.1.) On or about December 11, 2015, Uber issued an updated Services Agreement and Driver

Addendum, and Plaintiffs once again accepted that agreement by clicking "YES, I AGREE" on two separate screens.

Courts applying New York law consistently have held that "customers accept revised terms of their accounts by continuing to use their accounts after receiving the revised terms." *Valle v. ATM Nat'l, LLC*, 14-CV-7993, 2015 WL 413449, at *3 (S.D.N.Y. Jan. 30, 2015); *Roberts v. Edith Roman Holdings, Inc.*, 10-Civ.-4457, 2011 WL 2078223, at *3 (S.D.N.Y. May 19, 2011) ("New York law gives full effect to merger clauses. . . .When the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished.") (internal citation omitted); *Anonymous v. JP Morgan Chase & Co.*, 05-Civ. 2442, 2005 WL 2861589, at *4 (S.D.N.Y. Oct. 31, 2005) (finding that continued use of a credit card meant that plaintiff had "agreed to the terms of the Arbitration Agreement"); *Tsadilas*, 786 N.Y.S. 2d 478 (finding that after defendant sent the arbitration provision to plaintiff, plaintiff consented by "failing to opt out and by continuing to use her credit cards" and finding that plaintiff was therefore "bound by the arbitration provision even if she did not read it") (internal citations omitted).

Furthermore, even if the conduct underlying the present dispute occurred prior to the issuance of the December 2015 Services Agreement, "[t]he Second Circuit has held that arbitration clauses without an express limitation to 'future disputes' should be applied to any preexisting claims." *Reid v. Supershuttle Int'l, Inc.*, 08-CV-4854, 2010 WL 1049613, at *6 (E.D.N.Y. Mar. 22, 2010) (citing *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir. 1972) and *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999)). Therefore "[t]he relevant question is not when the plaintiffs' claims arose, but whether they arise under their agreements with the defendants." *Id.*

*See also Smith/Enron Cogeneration Ltd. Partnership, Inc.*, 198 F.3d at 99 ("As the arbitration clause here . . . does not contain any temporal limitation, the relevant inquiry is whether SCI's claims 'relat[e] to any obligation or claimed obligation under' the . . . Agreement, not when they arose.").[14]

For these reasons, the December 2015 Services Agreement is the operative agreement in this case.

## III. THE PARTIES CLEARLY AND UNMISTAKEABLY DELEGATED THE GATEWAY ARBITRABILITY ISSUES TO THE ARBITRATOR

Parties to a contract can agree to arbitrate 'gateway' questions of 'arbitrability,'" which are "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001). Such a delegation provision "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce" and is "valid under § 2 save upon such grounds as exist at law or in equity for the revocation of any contract." *Rent-A-Center, West, Inc.*, 561 U.S. at 70 (internal quotations omitted). However, '[c]ourts should not

---

[14] *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391 (2d Cir. 2015) is not to the contrary. In *Holick*, the Court declined to apply the *Coenen* rule because "the presumption of arbitrability [was] overcome . . . [by] positive assurance that the arbitration clause's scope . . . [was] temporally limited." *Id.* at 398. In *Holick*, the plaintiffs had originally signed a "Sales Agreement" designating them as independent contractors, and requiring that disputes be submitted to mediation. *Id.* at 393. The plaintiffs later signed a "Compensation Agreement" that changed their status to employees and included an arbitration provision. The claims at issue in *Holick* were that Defendant had misclassified the plaintiffs as independent contractors prior to the signing of the Compensation Agreement. *Id.* at 394. The Court refused to apply the Compensation Agreement and its arbitration provision retroactively, because "when the Compensation Agreements were signed, the parties' contractual positions changed in a way that impacted arbitrability," namely, the plaintiffs became employees of Defendant. *Id.* Here, in contrast, Plaintiffs' contractual positions did not materially change between the signing of the April 2015 Services Agreement and the signing of the December 2015 Services Agreement.

assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 79. This "revers[e] presumption . . . favor[s] . . . a judicial, rather than an arbitral, forum." *Id.*; *see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) ("The law generally treats arbitrability as an issue for judicial determination 'unless the parties clearly and unmistakably provide otherwise.'" (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002))). The FAA governs the analysis of whether questions of arbitrability have been delegated. *See Rent-A-Center, West, Inc.*, 561 U.S. at 70 (explaining that "the FAA operates on this additional arbitration agreement just as it does on any other").

As noted, the delegation clause in the December 2015 Services Agreement provides that, with the exception of "disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver," the arbitrator will decide "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision." (December 2015 Services Agreement, at § 15.3(i).) The December 2015 Arbitration Provision also incorporate by reference the JAMS Streamlined Arbitration Rules and Procedures, which explicitly state that the arbitrator will decide issues of arbitrability. (*Id.*; JAMS Streamlined Arbitration Rules and Procedures, 8(b) (2014)).

The delegation clause's language that an arbitrator will decide disputes "arising out of or relating to interpretation or application of this Arbitration Provision, including [its] enforceability, revocability or validity," clearly and unmistakably delegates the gateway issues to the arbitrator, and courts consistently have found clear and unmistakable delegation from similar language. *See Rent-A-Center, West, Inc.*, 561 U.S. at 62 (finding that delegation clause

providing that "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable," delegated the gateway question of whether the arbitration agreement was unconscionable to the arbitrator); *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208–09 (2d Cir. 2005) (where agreement provided that "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement", there was a clear and unmistakable delegation of arbitrability questions as to the signatory). At least five district courts have found clear and unmistakable delegation of arbitrability questions based on identical language in Uber's service agreements within the past year. *See Gunn v. Uber Techs., Inc.*, 16-CV-1668, 2017 WL 386816, at *7 (S.D. Ind. Jan. 27, 2017) (finding clear and unmistakable delegation of arbitrability where the agreement provided that "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of [it] . . . shall be decided by an Arbitrator and not by a court or judge"); *Lee v. Uber Techs., Inc.*, 15-C-11756, 2016 WL 5417215, at *4 (N.D. Ill. Sept. 21, 2016) (same); *Suarez v. Uber Techs.*, 8:16-CV-166, 2016 WL 2348706, at *4 (M.D. Fla. May 4, 2016) (same); *Varon v. Uber Techs., Inc.*, 15-CV-3650, 2016 WL 1752835, at *6 (D. Md. May 3, 2016) (same); *Sena v. Uber Techs. Inc.*, 16-CV-02418, 2016 WL 1376445, at *3–4 (D. Ariz. April 7. 2016) (same).

The Service Agreement's provision requiring that a court decide "disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver"—sometimes referred to as a "carve-out"—does not negate a finding of clear and unmistakable delegation to the arbitrator to decide whether the parties entered a valid arbitration agreement and whether the

present dispute falls within the scope of the arbitration agreement. As dictated by the carve-out provision, the Court has addressed Plaintiffs' challenge to the validity of the Class Action Waiver in a separate section, below, rather than leaving that issue to be determined by the arbitrator. But the fact that the parties have agreed that the Court will address issues relating to the Class Action Waiver does not undercut, or render unclear, the separate delegation of the question of the validity of the arbitration agreement as a whole or the scope of that agreement. "[A] contract should be construed so as to give full meaning and effect to all of its provisions," *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996). Construing the Class Action carve-out to negate delegation of arbitrability would render the arbitrability provisions meaningless. Other courts interpreting Uber Services Agreements containing identical or nearly identical Class Action Waiver or PAGA carve-out provisions have uniformly upheld delegation of arbitrability questions. *See Mohamed v. Uber Techs.*, 15-CV-16178, 2016 WL 7470557, at 4–5 (9th Cir. Sept. 7, 2016) (finding that "[t]he delegation provisions clearly and unmistakably delegated the question of arbitrability to the arbitrator for all claims except challenges to the class, collective, and representative action waivers in the 2013 Agreement [which mirrored the one at issue here]"); *Richemond v. Uber Techs., Inc.*, 16-CV-23267, 2017 WL 416123, at *3 (S.D. Fla. Jan. 27, 2017) (finding that Uber service agreements—including the December 2015 Agreement with the Class Action Waiver and PAGA carve-out—"explicitly provide[] that an Arbitrator shall decide [the plaintiff's] claims regarding the enforceability of his agreements with Uber"); *see also Congdon v. Uber Techs., Inc.*, 16-CV-2499, 2016 WL 7157854, at *2 (explaining that "the Ninth Circuit held that the arbitration provisions [with the carve-outs] effectively delegated the authority to decide on issues of arbitrability to the arbitrator").[15]

---

[15] The Second Circuit's decision in *NASDAQ OMX Grp., Inc.*, cited by Plaintiffs in a

Accordingly, the Court finds that the delegation clause in the December 2015 Services Agreement clearly and unmistakably delegates the gateway questions of arbitrability to the arbitrator.[16]

## IV. THE DELEGATION CLAUSE IS NOT UNCONSCIONABLE

Notwithstanding the Court's finding that the parties clearly and unmistakably delegated the gateway issues to the arbitrator, the Court must determine whether the delegation clause itself is procedurally or substantively unconscionable. Once again, New York law governs this analysis, because unconscionability is a question of state contract law.[17]

---

letter filed in *Guan* (16-cv-598, Dkt. 16), is distinguishable. There, UBS had initiated an arbitration proceeding against NASDAQ seeking, *inter alia*, damages for breach of a Services Agreement that contained a delegation clause that read: "Except as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies and other matters in question . . . shall be settled by final and binding arbitration." *Id.*, 770 F.3d at 1031. The panel found that this delegation clause did not clearly and unmistakably delegate arbitrability issues, because one of the provisions of the NASDAQ OMX Requirements "arguably immunize[d] NASDAQ from liability for the type of claim asserted by UBS" and it was therefore "far from 'clear and unmistakable' that the Services Agreement provide[d] UBS with an arbitrable claim." *Id.* at 1032. Unlike in *NASDAQ OMX,* in the instant case the qualifying provision is narrow and specific, only applying to the carve-out, not to the delegation of the arbitrability questions. Furthermore, *NASDAQ OMX* is distinguishable from this case because the delegation clause at issue there did not specifically address arbitrability, whereas the one in the December 2015 Services Agreement explicitly addressed the "enforceability, revocability [and] validity" of the Arbitration Provision, as well as its scope.

[16] Although the Court finds that the December 2015 Services Agreement is the operative agreement, it notes that the April 2015 Services Agreement even more clearly delegated arbitrability to the arbitrator, because it did not contain the class-action carve-out, simply specifying that "all . . . disputes . . . [shall] be resolved only by an arbitrator . . . including the enforceability, revocability or validity of the Arbitration Provision." April 2015 Services Agreement, at § 15.3(i).

[17] The December 2015 Service Agreement's choice-of-law provision (applying California law) does not apply to the Arbitration Provision, which is instead governed by the FAA. *See* December 2015 Services Agreement, § 15.1. However, the question of whether the delegation clause is unconscionable is governed by the law of the forum state. *See Sena*, 2016 WL 1376445, at *4 (whether a delegation clause is unconscionable "is a question of state contract

"Under New York law, a contract will be found unconscionable when it is 'so grossly unreasonable . . . in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Teah v. Macy's Inc.*, 11-CV-1356, 2011 WL 6838151, at *6 (E.D.N.Y. Dec. 29, 2011). In other words, a finding of unconscionability generally requires some showing of "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (internal quotation marks and citations omitted).

Substantive unconscionability addresses the content of the contract; and procedural unconscionability addresses the contract formation process and the lack of meaningful choice. *See Matter of Conifer Realty LLC (EnviroTech Servs., Inc.)*, 964 N.Y.S.2d 735, 739 (N.Y. App. Div. 2013). "Generally, there must be a showing that . . . a contract is both procedurally and substantively unconscionable" in order to preclude enforcement. *Ragone*, 595 F.3d at 121; *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 570 (S.D.N.Y. 2009) (same); *see also Teah*, 2011 WL 6838151, at *6 (articulating the same standard). However, "there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Ragone*, 595 F.3d at 122.

A delegation clause is severable from the arbitration agreement, which in turn is severable from the rest of the contract. *Rent-A-Center, West, Inc.*, 561 U.S. at 71–72. Accordingly, unless a party challenges the delegation clause separately from the arbitration

---

law"); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629–30 (2009) ("Section 2—the FAA's substantive mandate—makes written arbitration agreements 'valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of a contract . . .*") (emphasis added). As discussed above, applying the forum state's (New York's) choice-of-law provision leads to application of New York law.

agreement, the court must "treat it as valid under § 2, and must enforce it under [the FAA's provisions for compelling arbitration and staying the federal court action], leaving any challenge to the validity of the [Arbitration] Agreement as a whole for the arbitrator." *Id.* at 72. Therefore, the Court's inquiry here is limited to unconscionability challenges aimed specifically at the delegation clause in the arbitration agreement within the Services Agreement. The Court cannot consider, for example, Plaintiffs' argument that the Services Agreement is too long for Plaintiffs to have read or understood. However, to the extent that Plaintiffs argue that the delegation clause itself is unconscionable for the same reasons that the Services Agreements or arbitration provisions as a whole are unconscionable (Plaintiffs' Brief at 20–22), the Court considers those arguments *as applied* to the delegation clause. *Rent-A-Center*, 561 U.S. at 74.

### A. The Delegation Clause Is Not Procedurally Unconscionable

The 30-day opt-out provision in the Arbitration Agreement [or the delegation clause of the Arbitration Agreement] substantially negates any challenge of procedural unconscionability with respect to the delegation clause. Courts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting challenges of procedural unconscionability. *See Valle*, 2015 WL 413449, at *6 ("Procedurally, the provision is not unconscionable as plaintiffs had 45 days to opt out of the Arbitration Agreement and 60 days to opt out of the Amended Agreement."); *Teah*, 2011 WL 6838151, at *6 (finding that an arbitration agreement was not unconscionable in part because of a 30-day opt-out provision); *Tsadilas*, 786 N.Y.S. 2d at 480–81 (concluding that "[t]he arbitration provision alone is not unconscionable because plaintiff had the opportunity to opt out without any adverse consequences"); *Bank v. WorldCom, Inc.*, 122484/00, 2002 WL 171629, at *3 (N.Y. Sup. Ct. 2002) (rejecting plaintiff's argument that the arbitration provision was a contract of adhesion or

procedurally unconscionable "because the consumer is not in a 'take it or leave it' position—rather the consumer could easily choose to [cancel the contract]").

Indeed, in *Mohamed v. Uber Techs.*, 2016 WL 7470557, the Ninth Circuit held that the 30-day opt-out provision in an Uber service agreement precluded a finding that the delegation clause was procedurally unconscionable, explaining that "the existence of a meaningful right to opt-out of [arbitration] necessarily renders [the arbitration clause] (and the delegation clause specifically) procedurally conscionable as a matter of law." 2016 WL 7470557, at *5. In reaching this conclusion, the Ninth Circuit rejected the district court's finding that the delegation clause was procedurally unconscionable because it was "hidden in Uber's 'prolix [service agreement] form'". The court further found that the right to opt out was not illusory, even though under one of the agreements, the opt-out had to be in writing and delivered to Uber in-person or by overnight delivery service. *Id.* at *5–6.

Most, if not all, of the other courts to have addressed the same issue similarly have concluded that the 30-day opt-out provision in Uber's service agreements precludes a finding of procedural unconscionability. *See Lee*, 2016 WL 5417215, at *5 (holding that under Illinois or California law, "[s]imply put, the delegation provisions were not unconscionable because the plaintiffs had the right to opt out from those provisions . . . . Where there is [an opt-out provision], a procedural unconscionability argument is doomed to fail"); *Bruster v. Uber Techs., Inc.*, 188 F. Supp. 3d 658, 664 (N.D. Ohio 2016) (finding that the delegation clause was not procedurally unconscionable under Ohio law because of the 30-day opt out provision); *Sena*, 2016 WL 1376445 at *6 (upholding delegation clause, under Arizona law, against unconscionability challenge because of the 30-day opt-out provision, and because "[t]he Delegation Clause is not hidden or 'buried' in the Arbitration Provision [but] appears on the

27

second page of the Arbitration Provision, in normal font, conspicuously marked by the header, 'How This Arbitration Provision Applies.'"); *Suarez*, 2016 WL 2348706, at *4 (similarly rejecting challenge of procedural unconscionability under Florida law because of the 30-day opt-out provision); *Varon*, 2016 WL 1752835, at *5 (reaching the same conclusion under Maryland law; *Zawada v. Uber Techs., Inc.*, 16-CV-11334, 2016 WL 7439198, at *6 (E.D. Mich. Dec. 27, 2016) (reaching the same conclusion under Michigan law). Plaintiffs' argument that the 30-day opt-out window was "illusory" similarly fails. Both the April 2015 Services Agreement and the December 2015 Services Agreement allowed drivers to opt out via email, a much easier method than the hand-delivery or overnight delivery service method upheld as not illusory in *Mohamed*. *Mohamed*, 2016 WL 7470557, at *6.

Plaintiffs also argue that the delegation clause is procedurally unconscionable for many of the same reasons that they argued the Services Agreements as a whole were unconscionable, *i.e.*, the Services Agreements were not translated into Chinese, Uber used "high pressure tactics" of not allowing Plaintiffs' to start or resume work until clicking "YES, I AGREE," there was unequal bargaining power and education/experience among the parties, and the delegation clause was "hidden in Uber's 'prolix form.'" (Plaintiffs' Brief at 20-22.) Even if the Court considers these arguments to be properly directed at the delegation clause, they still fail. First, as previously discussed, Uber was under no legal obligation to translate its Services Agreement into other languages. Second, the Second Circuit has held that "[m]ere inequality in bargaining power" is not a basis under New York law for declining to enforce arbitration agreements in employment contracts, even when a contract was offered on a "take it or leave it" basis. *Ragone*, 595 F.3d at 121–22. Third, Plaintiffs' characterization of Uber's requirement that Plaintiffs could not work until they agreed to the terms of the Services Agreement as "high pressure

tactics" is grossly misleading and inaccurate.  Companies routinely require customers to agree to certain terms before letting the customer use the company's services.  That Plaintiffs were incentivized to quickly agree to the terms of the Services Agreement so that they could begin using the Uber App to find fares does not transform Defendant's request for a contractual agreement into "high pressure tactics."  *See Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 82 (S.D.N.Y. 2012) (describing a situation where "nothing compelled [the plaintiff] to sign the Agreement . . . , read or unread, other than his own internal impulsion to enroll in the stock-trading course at the lowest available price" as "a far cry from the paradigmatically coercive [setting] in which harsh terms are foisted on a consumer, in connection with the purchase of a necessity, with little practical ability to resist").  Lastly, the delegation clause is neither buried nor "hidden in Uber's 'prolix form,'" as Plaintiffs allege.  Rather, it appears on the third page of the Arbitration Provision, under the section titled "How This Arbitration Provision Applies."

**B.  The Delegation Clause is not Substantively Unconscionable**

Plaintiffs also argue that the delegation clause is substantively unconscionable because it requires Uber drivers to pay exorbitant arbitration fees and attorneys' fees.  The Supreme Court has made clear that the Court must view this challenge as one directed toward the "fee-splitting arrangement . . . for the arbitration of enforceability" rather than "for arbitration of more complex and fact-related aspects of the [claim.]"  *Rent-A-Center, West, Inc.*, 561 U.S. at 74.  The Court explained that in light of this requirement, it "may be more difficult to establish" unconscionability of fees relating only to arbitrability disputes.

Courts applying New York law have refused to find that fee-splitting provisions in arbitration agreements are unenforceable where plaintiffs have not affirmatively demonstrated that the fee-splitting provisions would preclude them from pursuing their rights in the arbitral

forum. *See Brady v. Williams Capital Grp., L.P.*, 928 N.E.2d 383, 384 (N.Y. 2010) (explaining that plaintiffs carry the burden of demonstrating that splitting the cost of arbitration would prevent them from effectively vindicating their rights (relying on *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S. 79 (2000)); *see also Stewart v. Paul, Hastings, Janofsky & Walker, LLP*, 201 F. Supp. 2d 291, 292–93 (S.D.N.Y. 2002) (finding that because plaintiff had not made a particularized showing about "ability to pay the arbitration fees and costs, the cost differential between arbitration and litigation in court, and whether that cost differential [was] so substantial as to deter the bringing of claims," plaintiff had "not established that the arbitration clause should not be enforced because the fees she would have to pay for arbitration effectively would deny her 'an adequate and accessible substitute forum in which to resolve [her] statutory rights,' much less that it render[ed] the entire agreement to arbitrate unenforceable").

Plaintiffs have failed to show that the fee-splitting provision at issue here is substantively unconscionable. First, Plaintiffs have not made a particularized showing of their inability to pay for arbitration, or a showing that the cost differential between arbitration and litigation in court is so substantial as to deter them from bringing their claims. Second and more importantly, the December 2015 Services Agreement contains a provision that greatly circumscribed the fee-splitting requirement in the April 2015 Services Agreement. This provision states that, "You will not be required to bear any type of fee or expense that You would not be required to bear if You had filed the action in a court of law". (December 2015 Services Agreement, at § 15.3(vi).) This provision further specifies that, "Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Uber shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute." *Id.* Thus, under the operative agreement in this case, the December 2015 Services Agreement, if this

matter is arbitrated, Plaintiffs will not have to bear any fees or expenses beyond what they would have had to pay to pursue this action in court. The Court therefore cannot find that Plaintiffs would be prevented from arbitrating a claim that they could otherwise afford to pursue in court, nor can the Court find that this is the "exceptional case[] where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Ragone*, 595 F.3d at 122.

Accordingly, the Court finds that the delegation clause in the Uber Services Agreement is neither procedurally nor substantively unconscionable.

## V.  VALIDITY OF THE CLASS ACTION WAIVER

In recent years, the Supreme Court has issued multiple decisions holding that class action waivers in arbitration agreements are enforceable. In *AT&T Mobility LLC v. Concepcion*, the Supreme Court struck down California's judicial rule that had held class action waivers in arbitration clauses unconscionable, finding that California's rule was preempted by the FAA. 563 U.S. 333, 352 (2011). The Court's holding made clear that such waivers are not unconscionable under federal law. Similarly, in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), the Court rejected plaintiffs' argument that the waiver of class arbitration would contravene the policies of the antitrust law, and held that a contractual waiver of class arbitration is enforceable under the FAA even when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery. *Id.* at 2312. The Court explained that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id.* at 2311. *See also DIRECTV, Inc. v.*

*Imburgia*, 136 S. Ct. 463, 471 (2015) (reaffirming its holding in *AT&T Mobility LLC*).[18] While the Court is sympathetic to Plaintiffs' arguments that being forced to arbitrate smaller claims on an individual basis will likely prevent them from pursuing their claims because the costs are prohibitive, the Court is bound to follow Supreme Court precedent. *See also Sena*, 2016 WL 1376445, at *7 (rejecting argument that class action waiver was substantively unconscionable, and explaining that contrary ruling "would conflict with *AT&T Mobility* and impede the purpose of the FAA, which is to 'ensure the enforcement of arbitration agreements according to their terms so as to facilitate informal, streamlined proceedings'"); *Zawada*, 2016 WL 7439198, at *8 ("The Supreme Court has held that class-action waivers in FAA-governed arbitration agreements are enforceable." (citing *AT&T Mobility LLC*, 563 U.S. at 341)); *Frankel v. Citicorp Ins. Servs., Inc.*, 11-CV-2293, 2014 WL 10518555, at *1 (E.D.N.Y. Aug. 12, 2014) (compelling arbitration in light of the Supreme Court's "line of cases [which have] aggressively enforced arbitration agreements containing class action waivers"), *R&R adopted*, 11-CV-2293, 2015 WL 6021534 (E.D.N.Y. Oct. 14, 2015).

Plaintiffs' argument that the class action waiver in the Uber Arbitration Agreement violates the National Labor Relations Act ("NLRA") also fails.[19] Even assuming that Plaintiffs

---

[18] Furthermore, under New York law, class action waivers in arbitration agreements regularly are upheld against challenges of unconscionability. *See, e.g.*, *Tsadilas*, 786 N.Y.S.2d at 480 (holding that the "arbitration provision is enforceable even though it waives plaintiff's right to bring a class action" and explaining that "[u]nder New York law, 'a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy.'") (quoting *Ranieri v. Bell Atl. Mobile*, 759 N.Y.S.2d 448 (2003)); *see also Nayal*, 620 F. Supp. 2d at 573 ("Courts applying New York law . . . have uniformly held that class action waivers are not unconscionable.").

[19] There is a reason to doubt whether Plaintiffs even qualify as employees under the NLRA. *See* December 2015 Services Agreement at § 13.1 (providing that "[e]xcept as otherwise expressly provided . . . the relationship between the parties under this Agreement is solely that of independent contracting parties" and that "[t]he parties expressly agree that . . . this Agreement is not an employment agreement, nor does it create an employment relationship . . . .") Recent

are employees under the NLRA, the Second Circuit has expressly stated that a waiver of class action arbitration does not violate the NLRA. *See Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297, n.8 (2d Cir. 2013) (rejecting the NLRB's finding that a waiver of the right to pursue a FLSA claim collectively in any forum violated the NLRA, and explaining that it "owe[d] no deference to [the NLRB's] reasoning"). Though there is disagreement among the circuits, *Sutherland* is consistent with the decisions of the Fifth and Eighth Circuits. *See Cellular Sales of Missouri, LLC v. NLRB*, 824 F.3d 772, 776 (8th Cir. 2016); *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 362 (5th Cir. 2013). *But see Morris v. Ernst & Young, LLP*, 834 F.3d 975, 983 (9th Cir. 2016) (vacating district court's order compelling individual arbitration under employee agreement containing a concerted action waiver); *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1154 (7th Cir. 2016) (holding that arbitration agreement mandating individual arbitration violated Section 7 of the NLRA). This Court must follow *Sutherland*, which compels the Court to reject Plaintiffs' challenge to the class action waiver as violative of the NLRA.[20]

---

decisions have delegated the question of whether drivers for Uber are employees or independent contractors to the arbitrator, without resolving it. *See Richemond*, 2017 WL 416123, at *4; *Singh*, 2017 WL 396545, at *7, n.7.

[20] Furthermore, even those Circuit courts that have held that class action waivers violate the NLRA have suggested that the result would or might have been different had there been an opt-out clause. *See, e.g.*, *Lewis*, 823 F.3d at 1155 (explaining that it was undisputed that assent to the arbitration provision was a condition of continued employment, and declining to decide the effect of an opt-out clause); *Morris*, 834 F.3d at 982, and n.4 (stating that an employer violates the NLRA "by conditioning employment on signing a concerted action waiver" and distinguishing *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072 (9th Cir. 2014), which held that there was no NLRA violation because the employee could have opted out of the individual dispute resolution agreement and chose not to). *See also Gunn v. Uber Techs.*, 2017 WL 386816, at *3–4 (distinguishing *Lewis* on that ground); *Scroggins v. Uber Techs.*, 16-CV-1419, 2017 WL 373299, at *3 (S.D. Ind. Jan. 26, 2017) (same).

## VI. THE ACTION IS STAYED PENDING ARBITRATION

Because the Court grants Defendant's motion to compel arbitration as to Plaintiffs' sole claim in this matter, the Court grants Defendant's request to stay this action pending arbitration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) (The FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay [is] requested.").

## CONCLUSION

Defendant's motion to compel arbitration is GRANTED.  These proceedings are stayed pending arbitration of Plaintiffs' claims.  The parties are directed to inform the Court of any resolution of the arbitration proceedings, or any other event, that would affect the stay of this matter.


SO ORDERED.


*/s/ Pamela K. Chen*
PAMELA K. CHEN
United States District Judge

Dated: February 23, 2017
        Brooklyn, New York